UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SAMANTHA FISHER )
Plaintiff )
)
)
)
v. ) Civ. Action No. 0312321-GAO
)
)
AT&T BROADBAND )
Defendant )
)

## MEMORANDUM IN SUPPORT OF
## AT&T BROADBAND'S MOTION FOR
## SUMMARY JUDGMENT ON
## ALL COUNTS OF THE PLAINTIFF'S COMPLAINT

The Defendant, AT&T Broadband (the "Company") respectfully requests that summary judgment be granted on all three counts of the plaintiff, Samantha Fisher's ("Fisher") Complaint because there are no material facts in dispute and the Company is entitled to judgment as a matter of law.

Fisher worked for the Company as a Community Access Coordinator from the summer of 1998 until November 21, 2000. Fisher coordinated the use of the Company's community access studios by town residents. Fisher first worked in the towns of West Bridgewater, Hanson and Whitman, and was then transferred to the access studio in Holbrook. While working at the West Bridgewater studio, Fisher developed a personal relationship with Robert Branczewski ("Branczewski"), the producer of the community access show "Cooking Creatively." "Cooking Creatively" was first produced in the West Bridgewater studio but was cancelled because Branczewski was not a resident of West Bridgewater. The Company requires that producers of community access programs be a resident of the town in which the studio is located.

Immediately upon being transferred to the Holbrook studio in March 2000, Fisher allowed Branczewski to resume production of "Cooking Creatively" at the Holbrook studio, even though he was also not a resident of Holbrook. More generally, in the seven (7) months she served as Community Access Coordinator in Holbrook, Fisher lost perspective on her responsibilities to the Company as they related to her personal relationship with Branczewski. The Company terminated Fisher's employment because it determined that she permitted her personal relationship with Branczewski to interfere with her job.

The Company seeks summary judgment on Fisher's gender discrimination claims (Counts I and III) because Fisher has no evidence, direct or circumstantial, that Company terminated her because she is female. In fact, Fisher admits under oath that she has no evidence that the motivation for her termination, in whole or in part, was because she is a woman.

The Company also seeks summary judgment on Fisher's "wrongful termination" claim (Count II) because it fails to state a cognizable claim upon which relief may be granted. It is difficult to determine what Fisher intends in labeling Count II "wrongful discharge." It is easy to say what it is not: Fisher has neither alleged a violation of an express or implied contract, nor has she alleged a violation of public policy claim. If, as it appears, Fisher is basing her "wrongful termination" claim on the same facts as her sex discrimination claim, it is preempted by Mass. Gen. L. ch. 151B.

## I.     UNDISPUTED FACTS

As required under Rule 56 of the Federal Rules of Civil Procedure, the facts set forth below are either undisputed or, if there is a dispute, are stated in the light most favorable to Fisher.

a. <u>Samantha Fisher's employment with the Company and the role of the Access Coordinator</u>.

In July 1997, U.S. West Media Group hired Samantha Fisher as a part- time Production Assistant. (Deposition transcript of Samantha Fisher, hereinafter "Fisher Dep," Tr. 22, attached at <u>Tab 1</u>).[1] In June 1998, US West Media Group formally changed its name to MediaOne of Massachusetts Inc. In 1999 MediaOne of Massachusetts Inc. became a subsidiary of AT&T Broadband LLC (hereinafter "the Company") (Fisher Dep. Tr. 20).[2]

Prior to being hired as a Production Assistant, Fisher worked as a part-time volunteer with the Company for about a year and a half. (Fisher Dep., Tr. 9). When she was hired as a full-time Production Assistant, Fisher signed an Employee Agreement, which among other things, stated that she was an employee at will. (Fisher Dep. Tr. 24-25; see also MediaOne Offer Letter and Employee Agreement attached at <u>Tab 4</u>). Fisher also received and reviewed the Company's Employee Handbook and a document entitled "Doing What's Right, Business Integrity and Ethics at MediaOne." (Fisher Dep. Tr. 129; see Acknowledgement of Receipt of Employee Handbook attached at <u>Tab 5</u>; see Certificate of Understanding at <u>Tab 6</u>; see Employee Handbook and "Doing What's Right, Business Integrity and Ethics as MediaOne," attached as <u>Exhibit D</u> and <u>Exhibit E</u> respectively to the Affidavit of Albert Duchaney, hereafter "Duchaney Aff.").

During the summer of 1998, Fisher began working at the Company full time as a Community Access Coordinator. (Fisher Dep., Tr. 62). Fisher worked thirty hours a week at the Company's community access studio in Whitman/Hanson and ten hours a week at the Company's community access studio in West Bridgewater. (Fisher Dep., Tr. 16; See also

---

[1] Unless otherwise indicated, all cited depositions and transcripts are attached as <u>Tabs 1-9</u> to "Record of Material in Support of AT&T Broadband's Motion for Summary Judgment on All Counts."
[2] Two years after Fisher's employment was terminated, Comcast of Massachusetts Inc. bought the assets of MediaOne.

3

Affidavit of Vicki Carabello, hereinafter "Carabello Aff.," ¶ 3). Vicki Carabello was Fisher's supervisor at the time. (Fisher Dep., Tr. 17; Carabello Aff. ¶ 3).

Pursuant to an agreement with the individual towns, the Company provides to town residents a studio, equipment and technical support so that a town resident can produce a television show. (Carabello Aff. ¶ 3; Duchaney Aff. ¶ 2; See Holbrook Renewal License attached as Exhibit A to Duchaney Aff.). These television shows are called community access programs. (Carabello Aff. ¶ 3). Pursuant to the license with the town, it was the Company's responsibility to manage the facilities for production of community programming by residents and organizations of the town. (Fisher Dep. Tr., 139; see also Holbrook Renewal License attached as Exhibit A to Duchaney Aff., section 5.2). It is a requirement that the producer of the community access program be a resident of the town in which the show is being produced. (Fisher Dep. Tr. 12-13, 34; Duchaney Aff. ¶ 3; Carabello Aff. ¶¶ 3, 9). Fisher was fully aware of this requirement. (Fisher Dep. Tr. 12-13, 34, 45, 68).

It was Fisher's job as an Access Coordinator to coordinate the use of the access facilities by community members, to train community members, and to provide technical support when needed. (Carabello Aff. ¶¶ 3, 7; Fisher Dep., Tr. 131; see also Access Coordinator Job Description, attached as Exhibit B to Duchaney Aff.). Fisher was to supervise the production of all of the access programs but not actually perform work on any of the programs. (Fisher Dep Tr. 40-44; Carabello Aff. ¶¶ 3, 7 & 11). It was also part of Fisher's job to enforce the Company's rule regarding resident producers. (Duchaney Aff. ¶ 3).

    b.    <u>Robert Branczewski and the development of "Cooking Creatively."</u>

In 1998, prior to Fisher becoming a full time Access Coordinator, Branczewski began filming a cooking show called "Cooking Creatively" out of the West Bridgewater studio. (Fisher

Dep. Tr. 29; Carabello Aff. ¶ 4). Branczewski first proposed the show to a friend from culinary school, Jeff Newell. Branczewski and Newell co-hosted "Cooking Creatively" for a period of time. When Newell left the show, Branczewski recruited Stephen McGuire, whom Branczewski also knew from culinary arts school, to serve as co-host along with Branczewski. (Branczewski Dep. Tr. 29). Branczewski was not a resident of West Bridgewater. (Fisher Dep. Tr. 33). Sometime in 1998, Fisher and Branczewski began a personal dating relationship. (Fisher Dep. Tr. 33).

In 1998-99, Vicki Carabello was the Company's Senior Program Manager for nine towns, including West Bridgewater. (Carabello Aff. ¶ 2). Carabello was told that Michelle Miller, a West Bridgewater resident, was the producer of "Cooking Creatively" and that Branczewski was one of the cooks. (Carabello Aff. ¶ 6). After learning about "Cooking Creatively," Carabello began noticing on Fisher's and Brian Liss' (also an Access Coordinator) timesheets that they were spending an inordinate amount of time working on "Cooking Creatively." (Carabello Aff. ¶ 7). She reminded both Fisher and Liss that it was not part of their job to work on the show, but rather to train and provide technical support when needed. (Carabello Aff. ¶ 7).

Thereafter, when it became apparent that Branczewski, a non-resident of West Bridgewater, was the producer in-fact of "Cooking Creatively" -- and therefore the program did not comply with the Company's rules regarding who can be a producer of an access community program (Carabello Aff. ¶¶ 9, 10) -- Carabello told Fisher, Branczewski and Liss that "Cooking Creatively" could no longer continue at the Bridgewater studio because of the residency requirement. (Carabello Aff. ¶¶ 10, 12). Because of the residency requirement, Carabello also told Fisher that Branczewski could not produce his show at the Whitman studio, where Fisher

5

also worked as an Access Coordinator. (Carabello Aff. ¶ 13). Carabello provided Branczewski with the telephone number of the AT&T studio in Brockton, the town in which he resided (Carabello Aff. ¶ 14), in the event that he wanted to produce "Cooking Creatively" there. He did not do so. (Branczewski Dep. Tr. 33).

    c. <u>Samantha Fisher is transferred to the Holbrook studio and "Cooking Creatively" follows.</u>

Between February and May 1999, "Cooking Creatively" was not produced out of the Company's studios. Sometime in April 1999, at a time when Fisher was still dating Branczewski, the Company transferred Fisher to work as the Access Coordinator at the community access studio in Holbrook, Massachusetts. (Fisher Dep. Tr. 58-59, 61-62). Fisher did not object to this transfer. (Fisher Dep. Tr. 59).

Less than six weeks later, "Cooking Creatively" followed. (Fisher Dep. Tr. 57). Fisher admits that at the time of the transfer, she spoke with Branczewski about producing "Cooking Creatively" in Holbrook. (Fisher Dep. Tr. 66). Neither Fisher nor Branczewski was a resident of Holbrook. (Fisher Dep. Tr. 67). "Cooking Creatively" restarted production at the end of May 1999, with Branczewski as the chef, with the same name, and with the same stove and countertops as had been used in West Bridgewater. (Fisher, Dep Tr. 57, 71-72, 79, 82-84).

At about this time, five boys from Holbrook High School sought volunteer work at the Holbrook studio. These school boys did not specifically seek to work on Branczewski's "Cooking Creatively" but rather were "interested in doing any kind of work." (Fisher Dep. Tr. 47-49). Fisher told the boys that they would be involved in the filming of selectmen meetings and school committee meetings and helping out with the production of shows. (Fisher Dep Tr. 51-52). Fisher says she introduced Branczewski to "the boys." (Fisher Dep. Tr. 69). Branczewski recalls meeting with just one of the boys, who told him that he could get a few

6

more boys for a crew. (Branczewski Dep. Tr. 77). Fisher thereafter told the Company that "the boys" were the producers of "Cooking Creatively" in Holbrook. (Fisher Dep. Tr. 91-92; Duchaney Aff. ¶ 9).

At the time, there were three community access programs in Holbrook, two of which were filmed out of the Holbrook studio. (Duchaney Aff. ¶ 6). In addition to "Cooking Creatively," "The Living Word" was taped at the Holbrook studio. A religious program, it was produced by a town resident, Gary Machaby. (Fisher Dep. Tr. 57-58, 64). Allan Dunn, a town resident and the Chairman of the Cable Advisory Board Committee, also had a Holbrook program that he taped offsite. (Fisher Dep. Tr. 55-56).

    d.    <u>Fisher's misplaced loyalties result in a breach of trust</u>.

Al Duchaney first became Fisher's supervisor when she was transferred to the Holbrook studio. (Fisher Dep., Tr. 60, 80). Duchaney was located out of the Norwell office, had responsibility for multiple locations, and visited the Holbrook studio only occasionally, once every few months. (Fisher Dep Tr. 81). Duchaney received complaints from Gary Machaby that a stove had been fully installed in the Holbrook studio for "Cooking Creatively" and that the cooking set interfered with the production of his show. (Duchaney Aff. ¶ 5). Upon visiting the Holbrook studio, Duchaney saw that "Cooking Creatively" had installed a full kitchen with a stove, countertops, cabinets on the walls, a sink, refrigerator, pots and pans and other cooking paraphernalia. (Duchaney Aff. ¶ 4). Branczewski had also bought and paid for the new countertops for the show. (Fisher Dep. Tr. 83-84). The "Cooking Creatively" set took up approximately two thirds of the Holbrook studio. (Duchaney Aff. ¶ 4). Fisher had allowed Branczewski, who was not a Company employee, to hire an electrician to install a 220 volt electrical line into the studio, which was located in the Town of Holbrook's Police Station.

(Fisher Dep. Tr. 84-88, 148-151). Fisher did not seek permission from the Company or from the town prior to making this alteration. (Fisher Dep. Tr. 85, 148-151). Fisher also did not use the Company provider nor did she even check if the electrician was a certified electrician. (Fisher Dep. Tr. 84-88, 148-151).

Because Fisher allowed this type of alteration to the studio to occur without first seeking permission from the Company, Fisher received a final written warning for her conduct. (See "MediaOne Personnel Action Report," attached as <u>Exhibit C</u> to Duchaney Aff.). Prior to issuing the written warning, Duchaney discussed the issue with Wendy Copithorne, his supervisor and manager, and with Bobbi Sym (a female), who was the Company's Regional Human Resources Director at the time. (Duchaney Aff. ¶ 5).[3]

Over a period of months, Duchaney began having concerns about Fisher's involvement with the "Cooking Creatively" and the true identity of its producer. (Duchaney Aff. ¶ 6). These concerns were based upon complaints that Fisher was working on the cooking show; feedback from Vicki Carabello regarding what previously occurred in the West Bridgewater studio; the weekend shoots Fisher reported to attend; and various other activities cooking show activities Fisher reported that she had engaged in. (Duchaney Aff. ¶ 6). Duchaney found that Fisher's level of involvement in the cooking show was much greater than her involvement with the other two shows. (Duchaney Aff. ¶ 6).

Fisher, sadly, did not learn anything from her experience in West Bridgewater concerning the difference between loyally performing her job as an Access Coordinator for the Company

---

[3] A similar situation had arisen at the West Bridgewater studio. Carabello first learned about "Cooking Creatively" when she was notified by the landlord of the West Bridgewater studio that a propane tank, and cooking apparatus for a cooking show had been installed and was being used in the studio without her permission. (Carabello Aff. ¶¶ 4 & 5). Branczewski had bought the stove for use on "Cooking Creatively." (Branczewski Dep. Tr. 34). The propane tank was removed and in order for the show to continue, a special electrical connection and venting mechanism were installed and approved by the Company, the West Bridgewater Fire Department, and the landlord. (Carabello Aff. ¶¶ 4 & 5).

and promoting her boyfriend's television personality. It is beyond belief that on the heels of "Cooking Creatively" being cancelled in West Bridgewater, because Branczewski was not a resident, Fisher would be the conduit through which Branczewski would repeat the violation. Much worse, in the short eight months in which they teamed up in Holbrook, their respective roles so blurred that it became difficult to determine which was the Company's employee and which was the producer and promoter of "Cooking Creatively." For example, in an apparent reversal of roles, as though *she* was a producer, Fisher organized a charity event, which promoted "Cooking Creatively," and she prepared a very detailed to-do list for the event, which listed herself and Robert as part of the crew. (Fisher Dep. Tr. 155-156; see Event Flyer attached at Tab 6; see also "Things to do to prepare for Howard," attached at Tab 7). As though *he* were the Company's employee, Branczewski, sent a letter to the Superintendent of the Holbrook schools regarding the event that listed "MediaOne" under Branczewski's signature. (See Letter to Superintendent of Holbrook Public Schools attached at Tab 8).[4]

Another incident indicating that Fisher was more loyal to Branczewski than she was to her job responsibilities concerned a newspaper interview of Branczewski that took place at the Holbrook studio in Fisher's presence. (Fisher Dep. Tr. 163-64). The Company's policy concerning communications with the media states that "if you haven't been specifically designated as a spokesperson, direct all media requests to your supervisor, who will forward them to a designated spokesperson." (See Employee Handbook, p. 9, attached as Exhibit D to Duchaney Aff.). Although Fisher was present in the studio and was aware of the media policy, she failed to notify her supervisor of the interview. (Fisher Dep. Tr. 165). Duchaney learned

---

[4] Although Duchaney had given Fisher permission to work on the event, he was not aware of these details. Nor was he aware that Fisher and "Cooking Creatively" were the actual organizers of the event. (Duchaney Aff. ¶ 8). He certainly did not authorize Branczewski to suggest to the Superintendent of Schools that Branczewski was an employee or agent of the Company.

9

about the interview after the fact, from Branczewski, when he called Duchaney to report an incident that occurred in the studio during the course of the interview. (Duchaney Aff. ¶ 12).

On or about November 13, 2000, Duchaney met with Fisher. (Duchaney Aff. ¶ 13). During this meeting it became clear to Duchaney that Branczewski was the actual producer of "Cooking Creatively," Id. Branczewski was making most, if not all, of the decisions regarding "Cooking Creatively." Id. Because Branczewski was not a resident of Holbrook, the show could not continue in the same manner. Id. Duchaney, however, allowed "Cooking Creatively" to finish taping through the end of the month. Id. According to Fisher, Branczewski decided instead to tell the Holbrook resident volunteers ("the boys") on November 14, 2000 that the show had to stop airing immediately. (Fisher Dep. Tr. 177-178).

Thereafter, Duchaney began to hear complaints from the Holbrook community about the alleged reasons for the show's cancellation. (Duchaney Aff. ¶ 14). Three days after Duchaney's and Fisher's meeting, Wendy Copithorne and Duchaney had another meeting with Fisher. (Duchaney Aff. ¶ 14). Duchaney recalls that Fisher reported that the boys had all quit when she told them that because they were minors, their parents needed to be with them. (Duchaney Aff. ¶ 14). This miscommunication resulted in negative publicity for the company and complaints from the town of Holbrook's Cable Advisory Board. Id.

Following discussions among Wendy Copithorne (Albert Duchaney's supervisor), Bobbi Sym (Regional Director of Human Resources), Michael Leone (Director of the Department), R.B. Lerch (the acting Vice President), Joyce Fitzgerald (Human Resources) and Albert Duchaney, the Company decided to terminate Ms. Fisher's employment. (Copithorne Dep. Tr. 17; Duchaney Aff. ¶ 15). Fisher had allowed her personal relationship with Branczewski to interfere with her job responsibilities and had violated the Company's conflict of interest and

10

media policies. (Duchaney Aff. ¶ 15). On November 21, 2000, Wendy Copithorne, Duchaney and Joyce Fitzgerald met with Fisher. Ms. Copithorne informed Fisher that her employment was being terminated because she had violated Company policies. (Duchaney Aff. ¶ 16; Fisher Dep. Tr. 178-180). As Fisher testified, the reason Ms. Copithorne gave for Fisher's termination was: "That Al couldn't trust me anymore." (Fisher Dep. Tr. 179-180) (emphasis added).

    e.    Fisher's "replacements".

Following the termination of Fisher's employment, the duties of the Access Coordinator were covered by a team of individuals. (Duchaney Aff. ¶ 17). These individuals included Debi Donna, Michele Roy and Albert Duchaney. (Duchaney Aff. ¶ 17). On or about November 27, 2000, the Company posted a staffing requisition, seeking a replacement for the Access Coordinator position in Holbrook. (See MediaOne Staffing Requisition attached as Exhibit F to Duchaney Aff.). Duchaney also interviewed several outside candidates for the position. (Duchaney Aff. ¶ 17). Two months later, in mid-January 2001, the Company decided to transfer Kevin Bows, who was working as an Access Coordinator in the Dedham studio, to the Holbrook studio. (Duchaney Aff. ¶ 17). Kevin Bows remained at the Holbrook studio until November 2002, when he was replaced by Evelyn Young. (Duchaney Aff. ¶ 17).

## II.    LEGAL ARGUMENT

Under Fed. R. Civ. P. 56(c), the district court shall enter summary judgment for the moving party if the record discloses "that there are no genuine issues as to any material fact and that the moving party is entitled to a judgment as a matter of law." Szabo v. Trustees of Boston University, 1998 U.S. App. LEXIS 32720 *2 (1st Cir.,1998). Rule 56 mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. Even in an employment discrimination

case, where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable references and unsupported speculation. Smith v. Stratus Computer Inc., 30 F.3d 11, 13 (1st Cir. 1994). The plaintiff must point to specific facts detailed in affidavits and depositions – that is names, dates, incidents and supporting testimony – giving rise to an inference of discriminatory animus. Luciano v. Coca-Cola Enterprises Inc., 307 F. Supp. 2d 308, 318 (D. Mass. 2004). Otherwise, discrimination law would be unmanageable if disgruntled employees could defeat summary judgment by affidavits simply speculating about a defendant's motives. See Scott v. Sulzer Carbomedics Inc., 141 F. Supp. 2d 154, 160 (D. Mass. 2001) citing Visser v. Packer Engineering Assoc., 924 F.2d 655, 659 (7th Cir. 1991).

I.  **THE COMPANY IS ENTITLED TO SUMMARY JUDGMENT ON FISHER'S CLAIMS UNDER TITLE VII AND MASS. GEN. L. CH. 151B BECAUSE SHE CANNOT PUT FORTH SUFFICIENT EVIDENCE FOR EACH ESSENTIAL ELEMENT.**

The Company is entitled to judgment as a matter of law on Fisher's sex discrimination claims under Title VII and under Mass. Gen. L. ch. 151B because Fisher cannot put forth sufficient evidence for each essential element of her claim.[5]

Under both federal and state law, Fisher's case is governed by the McDonnell Douglas framework for circumstantial proof of discrimination. See Scott, 141 F. Supp. 2d 154, 171 (D. Mass. 2001) citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973); see also Matthews v. Ocean Spray Cranberries Inc., 426 Mass. 122, 127-128 (1997)(in employment discrimination cases alleging disparate treatment under 151B, we allocate the burden of producing evidence according to the framework set forth by the U.S. Supreme Court under the Federal antidiscrimination provisions of Title VII of the Civil Rights Act of 1964) *citing*

---

[5] Although Fisher includes in her Complaint the heading "Violation of Federal Law (42 USC 2000 et. seq.)," Fisher fails to state a claim under Title VII. (See Complaint and Request for Jury Trial, Count III). Fisher instead restates in Count III that the Company "violated the Massachusetts Anti-Discrimination Laws." Accordingly, Fisher should be precluded from bringing a claim under Title VII.

McDonnell Douglas Corp. at 802. Fisher must first make a prima facie showing of discrimination. If she succeeds, the burden shifts to the Company to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Id. If the Company is successful in proffering a nondiscriminatory explanation, Fisher must then show that the Company's reason is a pretext to mask unlawful discrimination. Id.

    a.    <u>Fisher cannot put forth sufficient evidence to establish prima facie case of discrimination under either Title VII or Mass. Gen. L. ch. 151B.</u>

In order to make a prima facie case of sex discrimination, Fisher must show: (1) she is a member of a protected class; (2) she was performing her job at a level that rules out the possibility that she was fired for inadequate job performance; (3) she suffered an adverse job action by her employer; and (4) her employer sought a replacement for her with roughly equivalent qualifications. Duncan-Young v. Pine Street Inn, 1997 U.S. Dist. LEXIS 3435, *5 (D. Mass 1997)(Massachusetts' practice is make out a prima facie case similar to that required by the federal standard).

Although Fisher is a member of a protected class (female), and did suffer an adverse job action, she was not performing her job "at a level that rules out the possibility that she was fired for inadequate job performance." Fisher violated the Company's conflict of interest policy when she allowed her personal interest in Branczewski and his "Cooking Creatively" production to interfere with the performance of her job. The undisputed facts establish that her supervisor simply "could no longer trust her." (Fisher Dep. Tr. 179-80); See Scott, 141 F. Supp. 2d at 172-173 (summary judgment granted to defendant under Mass. Gen. L. ch. 151B where plaintiff failed to raise a genuine issue of material fact as to whether she performed her job at an acceptable level; the plaintiff's ancillary successes do not redeem her deficient performance in the primary functions of her job).

b.  The Company has met its burden of producing a legitimate, non-discriminatory reason for terminating Ms. Fisher's employment.

Even if Ms. Fisher meets her prima facie case, the Company has put forth a sufficient, legitimate non-discriminatory reason for terminating her employment. Majahad v. Reich, 915 F. Supp. 499, 501-502 (D. Mass. 1996)(after the employee has made this initial showing, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the employee's termination). The Company's burden is one of production as opposed to persuasion. See Gunther v. The Gap Inc., 1 F. Supp. 2d 732, 78 (D. Mass 1998); see also Matthews, 426 Mass. at 128 (the defendant's burden of production is not onerous).

The Company terminated Fisher's employment because, in violation of the Company's conflict of interest policy, Fisher allowed her personal relationship with her boyfriend to conflict with her job responsibilities. She permitted him to produce his show in Holbrook, even though he was not a resident of Holbrook, ignoring the prior experience in West Bridgewater; and she allowed him to do so under the ruse that high school volunteers "produced" Branczewski's "Cooking Creatively." Fisher also allowed him to make an alteration to the studio without the Company's permission. Overall, Fisher permitted her boyfriend to effectively act as though he were the Company's employee. The Company had every reason to conclude that it could "no longer trust" Fisher's judgment. See Gunther v. The Gap, Inc., 1 F. Supp. 2d 73, 78 (D. Mass. 1998) (The Gap satisfies its burden of production under Mass. Gen. L. ch. 151B for summary judgment purposes by producing admissible evidence that Gunther was discharged for not following a company policy of which she had knowledge); Majahad v. Reich, 915 F. Supp. 499, 501-502 (D. Mass. 1996) (the affidavits explaining that the plaintiff was fired for his repeatedly improper and unprofessional behavior, as well as his inability to accept criticism, clearly suffice as evidence of a nondiscriminatory motive for his termination); see Pryor v. Holiday Inns, Inc.,

14

401 Mass. 506, 511 (1988)(finding general dissatisfaction with plaintiff's attitude and work performance to be enough to establish a legitimate discharge under Mass. Gen. L. ch. 151B).

    c.    <u>Fisher's claims under Title VII and Mass. Gen. L. ch. 151B cannot be supported; she cannot marshall sufficient evidence for even an inference that the decision to terminate her employment was because of gender discrimination.</u>

Under the McDonnell Douglas framework, once the Company has articulated a legitimate, nondiscriminatory reason, the presumption raised by the prima facie showing drops from the case and the burden shifts back to Fisher. In order to survive summary judgment, Fisher must put forth sufficient evidence that the Company's decision to terminate her employment was because of sex discrimination. See <u>Szabo v. Trustees of Boston University et. al.</u>, 1998 U.S. App. LEXIS 32720 *7 (1st Cir.,1998); see also <u>Lipchitz v. Raytheon Co.</u>, 434 Mass. 493, 505 (2001)(under the plain language of G.L. c. 151B §4, liability attaches when an adverse employment decision is made because of discrimination); see also <u>Matthews</u>, 426 Mass. at 128 (under 151B, the plaintiff bears the burden of persuasion on the ultimate issue of discrimination, and therefore must produce evidence sufficient to support a jury verdict that it was more likely than not that the articulated reason was pretext for actual discrimination); see also <u>Gunther</u>, 1 F. Supp. 2d at 78 (under 151B, plaintiff must demonstrate that the proffered reason for an adverse employment action is merely pretextual for sex discrimination in order to survive the motion for summary judgment).

There is no evidence, circumstantial or direct, that the real reason for the termination of her employment was sex discrimination. In fact, Fisher admits in her deposition that there <u>is no</u> evidence of discriminatory motives on the part of the Company.

    Q.    What evidence do you have that the motivation for your termination in whole or in part was because you are a woman?

> A.  *I have no evidence.*
>
> Q.  Count two of the complaint is entitled wrongful termination. Do you believe that you were wrongfully terminated?
>
> A.  *Yes.*
>
> Q.  In what way?
>
> A.  *I believe that I did a good job at what I did and I was let go for reasons that I didn't have any control of.*

(Fisher Dep. Tr. 101 (emphasis added).

Fisher admittedly cannot point to any evidence that the Company's reason for terminating her, in whole or in part, was motivated by discriminatory animus. That is because there is no evidence, direct or circumstantial, that her gender had anything do to with the termination of her employment. See Szabo, 1998 U.S. App. LEXIS at 8 (before becoming entitled to bring the case before the trier of fact, the plaintiff must show evidence sufficient for the factfinder reasonably to conclude that the employer's decision to discharge him or her was wrongfully based on the alleged discriminatory animus); Matthews, 426 Mass. at 131 (Mass. Gen. L. ch. 151B does not grant relief to a plaintiff who has been discharged unfairly, even by the most irrational of managers, unless the facts and circumstances indicate that discriminatory animus was the reason for the decision); Duncan-Young, 1997 U.S. Dist. LEXIS at *10-11 (courts may not sit as super personnel departments, assessing the merits—or even the rationality—of employers' nondiscriminatory motives) *citing* Mesnick v. General Elec. Co., 950 F. 2d 816, 825 (1st Cir. 1991), cert. denied, 504 U.S. 985 (1992). Indeed, the overall circumstances suggest that the Company made a rationale, non-discriminatory, business judgment in terminating Fisher's employment some seven (7) months after she became the Access Coordinator in Holbrook.

Because Fisher cannot meet her evidentiary burden, summary judgment should be granted to the Company.

**II.   THE COMPANY IS ENTITLED TO SUMMARY JUDGMENT ON COUNT II OF FISHER'S COMPLAINT.**

The Company is entitled to summary judgment on Count II of Fisher's Complaint because she has failed to state a cognizable claim -- of any shape, form or description. Fisher simply alleges in Count II that she "was wrongfully terminated by AT&T as a result of the improper and unlawful actions of AT&T." (See Complaint and Request for Jury Trial, Count II, ¶ 25). Fisher was an employee at will. (See Offer and Agreement Letter attached at Tab 4; see Employee Handbook attached as Exhibit D to Duchaney Aff.; see also "Doing What's Right" attached as Exhibit E to Duchaney Aff.). In Count II, Fisher has not pled any of the exceptions to the employee at will doctrine. She has not pled a violation of public policy or a breach of express or implied contract. Nor did she allege one of the exceptions to the well established employee at will doctrine. When questioned at her deposition regarding this "wrongful discharge claim," Fisher testified as follows:

> Q: Count two of the complaint is entitled wrongful termination. Do you believe that you were wrongfully terminated?
>
> A: *Yes.*
>
> Q: In what way?
>
> A: *I believe that I did a good job at what I did and I was let go for reasons that I didn't have any control of.*

(Fisher Dep. Tr. 101) (emphasis added).

Finally, if her "wrongful discharge" claim is based upon the same facts and allegations as her gender discrimination, it is preempted by Mass. Gen. L. ch. 151B and likewise should be

dismissed.  See Melley v. The Gillette Corp., 19 Mass. App. Ct. 511, 523-524 (1984)(151B is a comprehensive remedial statute and therefore the creation of a new common law action based on the public policy expressed in that statute would interfere with that remedial scheme; dismissal of the plaintiff's claim that his employer's action violated public policy against age discrimination and was therefore a breach of an implied covenant of good faith and fair dealing is affirmed); Tuccelli v. Bull HN Information Systems, 1994 Mass. Super. LEXIS 374 (Mass. Super 1994) (the remedial scheme offered by 151B is comprehensive and exclusive of any contractual remedy, therefore summary judgment is granted on the plaintiff's contract claim).

## CONCLUSION

The Company respectfully submits that there are no genuine issues of material fact to be tried and that it is entitled to judgment as a matter of law on all three counts of the Plaintiff's Complaint. Therefore the Company request that this Court enter summary judgment in its favor.

AT&T BROADBAND LLC
By its attorneys,

_____
Barry J. Waters, BBO# 645595
bwaters@murthalaw.com
Laurie Alexander-Krom, BBO# 637385
lalexander-krom@murthalaw.com
Murtha Cullina LLP
99 High Street
Boston, MA 02110-2320
Telephone:  617-457-4000
Fax:  617-457-4000

Certificate of Service
I hereby certify that on this day a true copy of the above document was served upon the attorney of record for each party by mail/by hand.
Date: 7/1/05

Date: July 1, 2005