UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SAMANTHA FISHER )<br>Plaintiff )<br>)<br>v. )<br>)<br>AT&T BROADBAND )<br>Defendant ) | Civ. Action No. 0312321-GAO |

### AT&T BROADBAND LLC'S SEPARATE STATEMENT OF UNDISPUTED FACTS

AT&T Broadband LLC (the "Company") submits this Separate Statement of Undisputed Facts in support of its Motion for Summary Judgment. As this is a motion for summary judgment, the following facts are taken in the light most favorable to the plaintiff. There may be facts listed below that the Company would challenge if there were a trial, but for purposes of this motion, the Company accepts the following facts:

1. In July 1997, U.S. West Media Group hired Samantha Fisher ("Fisher") as a part- time Production Assistant. (Deposition transcript of Samantha Fisher, hereinafter "Fisher Dep," Tr. 22, attached at Tab 1).[1]

2. In June 1998, US West Media Group formally changed its name to MediaOne of Massachusetts Inc. In 1999 MediaOne of Massachusetts Inc. became a subsidiary of AT&T Broadband LLC (hereinafter "the Company") (Fisher Dep. Tr. 20).[2]

---

[1] Unless otherwise indicated, all cited depositions and transcripts are attached as Tabs 1-9 to "Record of Material in Support of AT&T Broadband's Motion for Summary Judgment on All Counts."
[2] Two years after Fisher's employment was terminated, Comcast of Massachusetts Inc. bought the assets of MediaOne.

3.  Prior to being hired as a Production Assistant, Fisher worked as a part-time volunteer with the Company for about a year and a half. (Fisher Dep., Tr. 9).

4.  When she was hired as a full-time Production Assistant, Fisher signed an Employee Agreement, which among other things, stated that she was an employee at will. (Fisher Dep. Tr. 24-25; see also MediaOne Offer Letter and Employee Agreement attached at Tab 4).

5.  Fisher also received and reviewed the Company's Employee Handbook and a document entitled "Doing What's Right, Business Integrity and Ethics at MediaOne." (Fisher Dep. Tr. 129; see Acknowledgement of Receipt of Employee Handbook attached at Tab 5; see Certificate of Understanding at Tab 6; see Employee Handbook and "Doing What's Right, Business Integrity and Ethics as MediaOne," attached as Exhibit D and Exhibit E respectively to the Affidavit of Albert Duchaney, hereafter "Duchaney Aff.").

6.  During the summer of 1998, Fisher began working at the Company full time as a Community Access Coordinator. (Fisher Dep., Tr. 62). Fisher worked thirty hours a week at the Company's community access studio in Whitman/Hanson and ten hours a week at the Company's community access studio in West Bridgewater. (Fisher Dep., Tr. 16; See also Affidavit of Vicki Carabello, hereinafter "Carabello Aff.," ¶ 3). Vicki Carabello was Fisher's supervisor at the time. (Fisher Dep., Tr. 17; Carabello Aff. ¶ 3).

7.  Pursuant to an agreement with the individual towns, the Company provides to town residents a studio, equipment and technical support so that a town resident can produce a television show. (Carabello Aff. ¶ 3; Duchaney Aff. ¶ 2; See

Holbrook Renewal License attached as <u>Exhibit A</u> to Duchaney Aff.). These television shows are called community access programs. (Carabello Aff. ¶ 3).

8.  Pursuant to the license with the town, it was the Company's responsibility to manage the facilities for production of community programming by residents and organizations of the town. (Fisher Dep. Tr., 139; see also Holbrook Renewal License attached as <u>Exhibit A</u> to Duchaney Aff., section 5.2).

9.  It is a requirement that the producer of the community access program be a resident of the town in which the show is being produced. (Fisher Dep. Tr. 12-13, 34; Duchaney Aff. ¶ 3; Carabello Aff. ¶¶ 3, 9). Fisher was fully aware of this requirement. (Fisher Dep. Tr. 12-13, 34, 45, 68).

10.  It was Fisher's job as an Access Coordinator to coordinate the use of the access facilities by community members, to train community members, and to provide technical support when needed. (Carabello Aff. ¶¶ 3, 7; Fisher Dep., Tr. 131; see also Access Coordinator Job Description, attached as <u>Exhibit B</u> to Duchaney Aff.). Fisher was to supervise the production of all of the access programs but not actually perform work on any of the programs. (Fisher Dep Tr. 40-44; Carabello Aff. ¶¶ 3, 7 & 11). It was also part of Fisher's job to enforce the Company's rule regarding resident producers. (Duchaney Aff. ¶ 3).

11.  In 1998, prior to Fisher becoming a full time Access Coordinator, Robert Branczewski began filming a cooking show called "Cooking Creatively" out of the West Bridgewater studio. (Fisher Dep. Tr. 29; Carabello Aff. ¶ 4).

12.  Branczewski first proposed the show to a friend from culinary school, Jeff Newell. Branczewski and Newell co-hosted "Cooking Creatively" for a period of time.

3

When Newell left the show, Branczewski recruited Stephen McGuire, whom Branczewski also knew from culinary arts school, to serve as co-host along with Branczewski. (Branczewski Dep. Tr. 29). Branczewski was not a resident of West Bridgewater. (Fisher Dep. Tr. 33).

13. Sometime in 1998, Fisher and Branczewski began a personal dating relationship. (Fisher Dep. Tr. 33).

14. In 1998-99, Vicki Carabello was the Company's Senior Program Manager for nine towns, including West Bridgewater. (Carabello Aff. ¶ 2).

15. Carabello was told that Michelle Miller, a West Bridgewater resident, was the producer of "Cooking Creatively" and that Branczewski was one of the cooks. (Carabello Aff. ¶ 6).

16. After learning about "Cooking Creatively," Carabello began noticing on Fisher's and Brian Liss' (also an Access Coordinator) timesheets that they were spending an inordinate amount of time working on "Cooking Creatively." (Carabello Aff. ¶ 7). She reminded both Fisher and Liss that it was not part of their job to work on the show, but rather to train and provide technical support when needed. (Carabello Aff. ¶ 7).

17. Thereafter, when it became apparent that Branczewski, a non-resident of West Bridgewater, was the producer in-fact of "Cooking Creatively" -- and therefore the program did not comply with the Company's rules regarding who can be a producer of an access community program (Carabello Aff. ¶¶ 9, 10) -- Carabello told Fisher, Branczewski and Liss that "Cooking Creatively" could no longer continue at the Bridgewater studio because of the residency requirement. (Carabello Aff. ¶¶ 10, 12).

18. Because of the residency requirement, Carabello also told Fisher that Branczewski could not produce his show at the Whitman studio, where Fisher also worked as an Access Coordinator. (Carabello Aff. ¶ 13).

19. Carabello provided Branczewski with the telephone number of the AT&T studio in Brockton, the town in which he resided (Carabello Aff. ¶ 14), in the event that he wanted to produce "Cooking Creatively" there. He did not do so. (Branczewski Dep. Tr. 33).

20. Between February and May 1999, "Cooking Creatively" was not produced out of the Company's studios. Sometime in April 1999, at a time when Fisher was still dating Branczewski, the Company transferred Fisher to work as the Access Coordinator at the community access studio in Holbrook, Massachusetts. (Fisher Dep. Tr. 58-59, 61-62). Fisher did not object to this transfer. (Fisher Dep. Tr. 59).

21. Less than six weeks later, "Cooking Creatively" followed. (Fisher Dep. Tr. 57).

22. Fisher admits that at the time of the transfer, she spoke with Branczewski about producing "Cooking Creatively" in Holbrook. (Fisher Dep. Tr. 66). Neither Fisher nor Branczewski was a resident of Holbrook. (Fisher Dep. Tr. 67). "Cooking Creatively" restarted production at the end of May 1999, with Branczewski as the chef, with the same name, and with the same stove and countertops as had been used in West Bridgewater. (Fisher, Dep Tr. 57, 71-72, 79, 82-84).

23. At about this time, five boys from Holbrook High School sought volunteer work at the Holbrook studio. These school boys did not specifically seek to work on Branczewski's "Cooking Creatively" but rather were "interested in doing any kind of

work." (Fisher Dep. Tr. 47-49). Fisher told the boys that they would be involved in the filming of selectmen meetings and school committee meetings and helping out with the production of shows. (Fisher Dep Tr. 51-52).

24. Fisher says she introduced Branczewski to "the boys." (Fisher Dep. Tr. 69). Branczewski recalls meeting with just one of the boys, who told him that he could get a few more boys for a crew. (Branczewski Dep. Tr. 77). Fisher thereafter told the Company that "the boys" were the producers of "Cooking Creatively" in Holbrook. (Fisher Dep. Tr. 91-92; Duchaney Aff. ¶ 9).

25. At the time, there were three community access programs in Holbrook, two of which were filmed out of the Holbrook studio. (Duchaney Aff. ¶ 6). In addition to "Cooking Creatively," "The Living Word" was taped at the Holbrook studio. A religious program, it was produced by a town resident, Gary Machaby. (Fisher Dep. Tr. 57-58, 64). Allan Dunn, a town resident and the Chairman of the Cable Advisory Board Committee, also had a Holbrook program that he taped offsite. (Fisher Dep. Tr. 55-56)

26. Al Duchaney first became Fisher's supervisor when she was transferred to the Holbrook studio. (Fisher Dep., Tr. 60, 80). Duchaney was located out of the Norwell office, had responsibility for multiple locations, and visited the Holbrook studio only occasionally, once every few months. (Fisher Dep Tr. 81).

27. Duchaney received complaints from Gary Machaby that a stove had been fully installed in the Holbrook studio for "Cooking Creatively" and that the cooking set interfered with the production of his show. (Duchaney Aff. ¶ 5).

28. Upon visiting the Holbrook studio, Duchaney saw that "Cooking Creatively" had installed a full kitchen with a stove, countertops, cabinets on the walls, a

6

sink, refrigerator, pots and pans and other cooking paraphernalia. (Duchaney Aff. ¶ 4). Branczewski had also bought and paid for the new countertops for the show. (Fisher Dep. Tr. 83-84). The "Cooking Creatively" set took up approximately two thirds of the Holbrook studio. (Duchaney Aff. ¶ 4).

29. Fisher had allowed Branczewski, who was not a Company employee, to hire an electrician to install a 220 volt electrical line into the studio, which was located in the Town of Holbrook's Police Station. (Fisher Dep. Tr. 84-88, 148-151). Fisher did not seek permission from the Company or from the town prior to making this alteration. (Fisher Dep. Tr. 85, 148-151). Fisher also did not use the Company provider nor did she even check if the electrician was a certified electrician. (Fisher Dep. Tr. 84-88, 148-151).

30. A similar situation had arisen at the West Bridgewater studio. Carabello first learned about "Cooking Creatively" when she was notified by the landlord of the West Bridgewater studio that a propane tank, and cooking apparatus for a cooking show had been installed and was being used in the studio without her permission. (Carabello Aff. ¶¶ 4 & 5). Branczewski had bought the stove for use on "Cooking Creatively." (Branczewski Dep. Tr. 34). The propane tank was removed and in order for the show to continue, a special electrical connection and venting mechanism were installed and approved by the Company, the West Bridgewater Fire Department, and the landlord. (Carabello Aff. ¶¶ 4 & 5).

31. Because Fisher allowed this type of alteration to the studio to occur without first seeking permission from the Company, Fisher received a final written warning for her conduct. (See "MediaOne Personnel Action Report," attached as Exhibit C to Duchaney Aff.). Prior to issuing the written warning, Duchaney discussed the issue

with Wendy Copithorne, his supervisor and manager, and with Bobbi Sym (a female), who was the Company's Regional Human Resources Director at the time. (Duchaney Aff. ¶ 5).

32.  Over a period of months, Duchaney began having concerns about Fisher's involvement with the "Cooking Creatively" and the true identity of its producer. (Duchaney Aff. ¶ 6). These concerns were based upon complaints that Fisher was working on the cooking show; feedback from Vicki Carabello regarding what previously occurred in the West Bridgewater studio; the weekend shoots Fisher reported to attend; and various other activities cooking show activities Fisher reported that she had engaged in. (Duchaney Aff. ¶ 6). Duchaney found that Fisher's level of involvement in the cooking show was much greater than her involvement with the other two shows. (Duchaney Aff. ¶ 6).

33.  Fisher organized a charity event, which promoted "Cooking Creatively," and she prepared a very detailed to-do list for the event, which listed herself and Robert as part of the crew. (Fisher Dep. Tr. 155-156; see Event Flyer attached at Tab 6; see also "Things to do to prepare for Howard," attached at Tab 7). As though he were the Company's employee, Branczewski, sent a letter to the Superintendent of the Holbrook schools regarding the event that listed "MediaOne" under Branczewski's signature. (See Letter to Superintendent of Holbrook Public Schools attached at Tab 8).

34.  Although Duchaney had given Fisher permission to work on the event, he was not aware of these details. Nor was he aware that Fisher and "Cooking Creatively" were the actual organizers of the event. (Duchaney Aff. ¶ 8). He certainly did not

8

authorize Branczewski to suggest to the Superintendent of Schools that <u>Branczewski</u> was an employee or agent of the Company

35. A newspaper interview of Branczewski took place at the Holbrook studio while Fisher was present in the studio. (Fisher Dep. Tr. 163-64).

36. The Company's policy concerning communications with the media states that "if you haven't been specifically designated as a spokesperson, direct all media requests to your supervisor, who will forward them to a designated spokesperson." (See Employee Handbook, p. 9, attached as <u>Exhibit D</u> to Duchaney Aff.). Although Fisher was present in the studio and was aware of the media policy, she failed to notify her supervisor of the interview. (Fisher Dep. Tr. 165). Duchaney learned about the interview after the fact, <u>from Branczewski</u>, when he called Duchaney to report an incident that occurred in the studio during the course of the interview. (Duchaney Aff. ¶ 12).

37. On or about November 13, 2000, Duchaney met with Fisher. (Duchaney Aff. ¶ 13). During this meeting it became clear to Duchaney that Branczewski was the actual producer of "Cooking Creatively," <u>Id</u>. Branczewski was making most, if not all, of the decisions regarding "Cooking Creatively." <u>Id</u>. Because Branczewski was not a resident of Holbrook, the show could not continue in the same manner. <u>Id</u>. Duchaney, however, allowed "Cooking Creatively" to finish taping through the end of the month. <u>Id</u>.

38. According to Fisher, <u>Branczewski</u> decided instead to tell the Holbrook resident volunteers ("the boys") on November 14, 2000 that the show had to stop airing <u>immediately</u>. (Fisher Dep. Tr. 177-178).

9

39. Thereafter, Duchaney began to hear complaints from the Holbrook community about the alleged reasons for the show's cancellation. (Duchaney Aff. ¶ 14). Three days after Duchaney's and Fisher's meeting, Wendy Copithorne and Duchaney had another meeting with Fisher. (Duchaney Aff. ¶ 14). Duchaney recalls that Fisher reported that the boys had all quit when she told them that because they were minors, their parents needed to be with them. (Duchaney Aff. ¶ 14). This miscommunication resulted in negative publicity for the company and complaints from the town of Holbrook's Cable Advisory Board. Id.

40. Following discussions among Wendy Copithorne (Albert Duchaney's supervisor), Bobbi Sym (Regional Director of Human Resources), Michael Leone (Director of the Department), R.B. Lerch (the acting Vice President), Joyce Fitzgerald (Human Resources) and Albert Duchaney, the Company decided to terminate Ms. Fisher's employment. (Copithorne Dep. Tr. 17; Duchaney Aff. ¶ 15). Fisher had allowed her personal relationship with Branczewski to interfere with her job responsibilities and had violated the Company's conflict of interest and media policies. (Duchaney Aff. ¶ 15).

41. On November 21, 2000, Wendy Copithorne, Duchaney and Joyce Fitzgerald met with Fisher. Ms. Copithorne informed Fisher that her employment was being terminated because she had violated Company policies. (Duchaney Aff. ¶ 16; Fisher Dep. Tr. 178-180). As Fisher testified, the reason Ms. Copithorne gave for Fisher's termination was: "That Al couldn't trust me anymore." (Fisher Dep. Tr. 179-180) (emphasis added).

42.     Following the termination of Fisher's employment, the duties of the Access Coordinator were covered by a team of individuals. (Duchaney Aff. ¶ 17). These individuals included Debi Donna, Michele Roy and Albert Duchaney. (Duchaney Aff. ¶ 17).

43.     On or about November 27, 2000, the Company posted a staffing requisition, seeking a replacement for the Access Coordinator position in Holbrook. (See MediaOne Staffing Requisition attached as <u>Exhibit F</u> to Duchaney Aff.). Duchaney also interviewed several outside candidates for the position. (Duchaney Aff. ¶ 17).

44.     Two months later, in mid-January 2001, the Company decided to transfer Kevin Bows, who was working as an Access Coordinator in the Dedham studio, to the Holbrook studio. (Duchaney Aff. ¶ 17). Kevin Bows remained at the Holbrook studio until November 2002, when he was replaced by Evelyn Young. (Duchaney Aff. ¶ 17).

AT&T BROADBAND LLC
By its attorneys,

*/s/ Laurie Alexander-Krom*

Barry J. Waters, BBO# 645595
bwaters@murthalaw.com
Laurie Alexander-Krom, BBO# 637385
lalexander-krom@murthalaw.com
Murtha Cullina LLP
99 High Street
Boston, MA 02110-2320
Telephone: 617-457-4000
Fax: 617-457-4000

<u>Certificate of Service</u>
I hereby certify that on this day a true copy of the above document was served upon the attorney of record for each party by mail/by hand.
Date: 7/1/05

Date: July 1, 2005