# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

SAMANTHA FISHER,
**Plaintiff**

v.                                                    Civil Action No. 0312321 (GAO)

AT&T BROADBAND,
**Defendant**                                                    }

## RECORD OF MATERIAL IN SUPPORT OF THE OPPOSITION OF PLAINTIFF, SAMANTHA FISHER TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The Plaintiff, Samantha Fisher, provides the following documents in support of her Opposition to Defendant's Motion for Summary Judgment.

1.    True and accurate copy of extract of the deposition of Albert J. Duchaney (Vol. I) (Tab 1);

2.    True and accurate copy of extract of the deposition of Albert J. Duchaney (Vol. II) (Tab 2);

3.    True and accurate copy of extract of the deposition of Lou Russo (Vol. I) (Tab 3);

4.    True and accurate copy of AT&T Broadband's PEG Access Programming Operating Procedure (revised September 2000) (Fisher Depos. Exh. 11/Duchaney Depos. Exh. 7) (Tab 4);

5.    True and accurate copy of AT&T Broadband's PEG Access Programming Operating

Procedure (revised February 2001) (Fisher Depos. Exh. 12/Duchaney Depos. Exh. 8) (Tab 5);

6.   Letter from Madeline Yusa (Media One) to Samantha Fisher dated April 10, 2000 (Duchaney Depos. Exh. 9) (Tab 6);

7.   E-mails from Al Duchaney, respectively, 1) Jennifer Khoury and 2) Wendy Copithorne and others, both dated November 2, 2000 (Duchaney Depos. Exh. 28) (Tab 7).

January 30, 2006
Date

/s/ David O. Scott, Esquire
DAVID O. SCOTT, ESQUIRE
B.B.O. NO. 449165
LAW OFFICE OF DAVID O. SCOTT, P.C.
200 CHAUNCY STREET
MANSFIELD, MASSACHUSETTS 02048
TELEPHONE (508) 261-9777
dsesq@aol.com

## Certificate of Service

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF). No non-participants (NEF) as noted.

January 30, 2006
Date

/s/ David O. Scott, Esquire
DAVID O. SCOTT, ESQUIRE
B.B.O. NO. 449165
LAW OFFICE OF DAVID O. SCOTT, P.C.
200 CHAUNCY STREET
MANSFIELD, MASSACHUSETTS 02048
TELEPHONE (508) 261-9777
dsesq@aol.com

# TAB ONE

<pre>
1                                    Volume I
                                     Pages 1 to 187
2                                    Exhibits 1 to 11

3              UNITED STATES DISTRICT COURT

4               DISTRICT OF MASSACHUSETTS

5    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
     SAMANTHA FISHER,
6                    Plaintiff(s),

7         v.                          Civil Action
                                      No. 0312321-GAO
8    AT&T BROADBAND,
                     Defendant(s).
9    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

10

11        DEPOSITION OF ALBERT J. DUCHANEY, a witness

12   called by counsel for the Plaintiff, taken pursuant

13   to the applicable rules, before Diane L. McElwee,

14   Registered Merit Reporter and Notary Public in and

15   for the Commonwealth of Massachusetts, at the

16   LAW OFFICES OF DAVID O. SCOTT, P.C., 200 Chauncy

17   Street, Mansfield, Massachusetts, on Wednesday,

18   March 9, 2005, commencing at 10:10 AM.

19

20

21                    _____

22            DIANE L. McELWEE, RPR, RMR
                  152 Seekonk Street
23            Norfolk, Massachusetts 02056
              Tel. and Fax -- 508-528-1055
24            e-mail -- dlmdepos@yahoo.com
</pre>

1    was, because it was all brand new.

2        Q    I understand you are giving me your memory

3    and your best recollection.

4        A    So Vicky was -- she was like an area

5    manager.  I don't know if that was her title.  She

6    was an area manager.

7        Q    Similar to an area access supervisor, if

8    not --

9        A    Similar, yes.

10       Q    Did you ever discuss Brian Liss's employment

11   with Vicky Carabello at any time?

12       A    Only after the fact.

13       Q    What did Vicky Carabello tell you after the

14   fact about Brian Liss's employment?

15       A    Just that it had been terminated and she

16   couldn't talk about it.

17       Q    She could not talk about it to you?

18       A    He was my employee at that point.  I had

19   gone to one of those trainings you were asking about,

20   and I came back and found out Brian Liss didn't work

21   for me anymore.  That's why I said I never met him.

22       Q    To this day do you have any understanding as

23   to the reason for his termination, whether or not you

24   got that from Vicky Carabello or any other source?

1    A    I don't.  The only thing I know is that he

2    had some trouble that Vicky tried to help him with.

3    I really don't know anything about it.

4    Q    Do you know if that trouble involved his

5    alleged sexual harassment of an employee?

6    A    I don't know if that's why he was

7    terminated.  I remember after the fact there was a

8    connection between him and Samantha.

9    Q    And the connection that you remember, did

10   that involve sexual harassment or at least the

11   allegation of that?

12   A    It involved harassment.  I don't know if it

13   was sexual or not.

14   Q    How did you learn this information after the

15   fact about the alleged harassment?

16   A    Well, when I say after the fact, he was gone

17   from the company, and while I was at one of those

18   trainings, the decision was made to have Samantha

19   work in Holbrook.  Employees were moved around, sort

20   of like while I was gone.  Then Samantha, one of the

21   reasons she was in Holbrook was because there was a

22   fear that Brian Liss would know she worked in Easton.

23   Apparently she was there from time to time, too.

24   Q    Did you ever hear from any source that Brian

1    Liss was stalking Samantha Fisher?

2        A    I heard that he was sending her pages that

3    said 666 or things like that.

4        Q    Did you ever see any of the communications

5    between Brian Liss and Samantha Fisher?

6        A    Are you asking about emails or letters?

7        Q    Anything, emails, letters, pictures,

8    photographs.

9        A    I may have seen an email, but I really don't

10   recall it.  I think I knew about it more than I saw

11   it.

12       Q    Was it your decision to transfer Samantha

13   Fisher?

14       A    No.

15       Q    Who made that decision, if you know?

16       A    Vicky Carabello and I believe Wendy

17   Copithorne and HR.

18       Q    Always in a big company.  That's not a

19   question.

20       A    To your point earlier about who terminated

21   Brian Liss and I said Vicky Carabello, it wouldn't

22   have been just Vicky.  HR would have been involved.

23                  MR. SCOTT:  Can we take a

24   five-minute break.

1      A     Not that I recall.

2      Q     So to the best of your recall was that the

3  first contact in person or in telephone with Robert

4  Branczewski?

5      A     That's my recollection, yes.

6      Q     Would that have been approximately November

7  of whatever year Samantha Fisher was terminated?

8      A     Yes, it would.

9      Q     What did he say to you in that telephone

10  conversation?

11     A     He told me that Gary Machaby had barged into

12  the studio unannounced and was yelling at Samantha,

13  and so his concern was about Gary's abusive speech.

14  I think he might have used that expression.

15     Q     Did you take any efforts to investigate

16  whether or not the statement made by Robert -- and

17  for the purpose of this deposition, any time I say

18  "Robert," I am referring to Robert Branczewski.

19     A     Yes.

20     Q     Was --

21     A     Yes, I got in touch with Samantha, who was

22  my employee, to find out what had happened.

23     Q     And did she communicate back to you based on

24  that inquiry by you?

1      A     Yes.  She had explained that as a result of

2    the daylight savings from the weekend before her

3    programming mechanism was not correctly adjusted,

4    which needs to be done every time the time changes.

5    So Gary's program didn't run at the correct time, and

6.   Gary was upset about that and came in, started

7    shouting at her in front of other people, including a

8    reporter from The Patriot Ledger that was on the

9    premises.  So she had tried to smooth things over and

10   shoot out the show like right now and said, I can

11   force it out, or whatever the case was, and he

12   apparently had lost his temper about that.

13           So I had verified that had happened,

14   but at the same time lots of other questions were

15   raised, such as why is Robert Branczewski calling me,

16   not Samantha, and why was there a reporter in the

17   studio.  I didn't know anything about a reporter

18   being in there.

19           Then from there, over the course of the

20   next several weeks, more and more developed.

21     Q     Okay.  When Samantha Fisher contacted you

22   after you received the call from Robert, how did she

23   contact you back?  Was it in person, telephone,

24   email?

1    Q    And do you know what these agreements are

2    called generally?

3    A    Generally they are called the franchise

4    agreement, although I know that's not what Holbrook's

5    is called.  It may be called, Cable Television

6    Agreement with the Town of Holbrook, which is an

7    agreement between the company and the Town.  Our

8    department in addition had PEG, which is Public

9    Educational Government access policies.  That may not

10   be the exact title.  Access user policies is the more

11   common reference.

12   Q    Which of those various agreements would most

13   closely govern the use of the studio by the public?

14   A    By "most closely" do you mean with the most

15   detail, most level of detail?

16   Q    Correct.

17   A    The access user agreement.

18   Q    The franchise agreement with the Town, if

19   you know, does it cover not only the setting up of

20   space for a cable access studio, but it's a more

21   general agreement that covers cable, other aspects of

22   the cable industry within the town as well; is that

23   correct?

24                  MS. ALEXANDER-KROM:  Objection.

1       A     Not that I recall.

2       Q     So to the best of your recall was that the

3   first contact in person or in telephone with Robert

4   Branczewski?

5       A     That's my recollection, yes.

6       Q     Would that have been approximately November

7   of whatever year Samantha Fisher was terminated?

8       A     Yes, it would.

9       Q     What did he say to you in that telephone

10  conversation?

11      A     He told me that Gary Machaby had barged into

12  the studio unannounced and was yelling at Samantha,

13  and so his concern was about Gary's abusive speech.

14  I think he might have used that expression.

15      Q     Did you take any efforts to investigate

16  whether or not the statement made by Robert -- and

17  for the purpose of this deposition, any time I say

18  "Robert," I am referring to Robert Branczewski.

19      A     Yes.

20      Q     Was --

21      A     Yes, I got in touch with Samantha, who was

22  my employee, to find out what had happened.

23      Q     And did she communicate back to you based on

24  that inquiry by you?

1      A    Yes.  She had explained that as a result of

2    the daylight savings from the weekend before her

3    programming mechanism was not correctly adjusted,

4    which needs to be done every time the time changes.

5    So Gary's program didn't run at the correct time, and

6    Gary was upset about that and came in, started

7    shouting at her in front of other people, including a

8    reporter from The Patriot Ledger that was on the

9    premises.  So she had tried to smooth things over and

10    shoot out the show like right now and said, I can

11    force it out, or whatever the case was, and he

12    apparently had lost his temper about that.

13            So I had verified that had happened,

14    but at the same time lots of other questions were

15    raised, such as why is Robert Branczewski calling me,

16    not Samantha, and why was there a reporter in the

17    studio.  I didn't know anything about a reporter

18    being in there.

19            Then from there, over the course of the

20    next several weeks, more and more developed.

21      Q    Okay.  When Samantha Fisher contacted you

22    after you received the call from Robert, how did she

23    contact you back?  Was it in person, telephone,

24    email?

1      A    Yes.

2      Q    Did you ever speak with Gary about that

3   incident?

4      A    I don't believe I ever did.

5      Q    Why not?

6      A    The other details surrounding that evening

7   took on a life of their own and overshadowed the

8   original reason for the call.

9      Q    Did you make the decision on behalf of the

10   cable company to terminate Samantha Fisher?

11      A    Not on my own, no.

12      Q    Did you raise the issue to others within the

13   organization?

14      A    Which issue?

15      Q    Termination of Samantha Fisher.  How did it

16   first arise?  Did you suggest it, or did someone else

17   suggest it?

18      A    I don't specifically recall who suggested

19   that be the course we take.

20      Q    Was it a mutual decision that you made with

21   other people?

22      A    It was a mutual decision we arrived at.

23      Q    Who are the other people involved in that

24   mutual decision?

1    as an employee of the company?

2        A    No, it wouldn't be fair to say that.

3        Q    Doesn't the cable access studio provide the

4    equipment, provide training for using the equipment?

5        A    Yes.  I was talking about way beyond that

6    level of support.

7        Q    What specific things did you become aware of

8    regarding Samantha Fisher that indicated to you that

9    she was providing inappropriate levels of support?

10       A    Primarily from Gary Machaby, as well as I

11   was informed there had been a history with this show

12   in other towns.

13       Q    Was she the cable access coordinator of

14   those other towns where that history of the show

15   occurred?

16       A    She wasn't specifically assigned to

17   whichever Bridgewater it was that Brian Liss was in,

18   but she was an access coordinator and she was working

19   in that town part of the time.

20       Q    She did not have primary responsibility for

21   what occurred in the studio that the show had

22   previously been associated with; is that correct?

23       A    It was before my time.  I don't know.

24       Q    Other than Gary Machaby telling you things

1   needed to be taken care of.

2       Q    What was the reason or the reasons why

3   Samantha Fisher was terminated?

4       A    In no particular order, there was the

5   violation of the policy about having media in the

6   studio without informing her supervisor and/or the

7   public relations people that that was going to

8   happen.  There was the conflict of interest just in

9   general with respect to the program.

10      Q    When you say "the program," are you --

11      A    Cooking Creatively.  I am sorry.

12      Q    Any other reasons?

13      A    Her handling of the communication to the

14  crew of that program and even though -- more

15  importantly than the way she handled it was the fact

16  she did not inform her supervisor about how badly it

17  had gone, which was the purpose of where we left

18  things in August; that I subscribed to a no-surprises

19  management style, and so I would rather have bad news

20  than no news.

21      Q    Any other reasons that you can recall?

22      A    Those are the general reasons.

23      Q    Are there any more specific reasons?

24      A    Well, they relate to those.  In hindsight it

1              identification)

2        Q      Exhibit 5 is the PEG Operating Procedure as

3    of 4/99; is that correct?

4        A      Yes.

5        Q      No. 6 is the PEG Operating Procedure Revised

6    January 2000; is that correct?

7        A      Yes.

8        Q      And 7 is the PEG Operating Procedure Revised

9    September 2000, correct?

10       A      Correct.

11       Q      Were any of these PEG Operating Procedures

12   in effect at the time when you had the discussion

13   with Samantha Fisher about Robert being the producer?

14       A      Yes.

15       Q      Which one or ones were in effect?

16       A      If it was 2000 where she was terminated,

17   then all three of them were.

18       Q      It appears there are three agreements

19   spanning a period of 4/99, the earliest one, to the

20   last one or latest one, September 2000, correct?

21       A      Yes, except they are not agreements.

22       Q      I am sorry.  Operating procedures.  I will

23   correct myself.  Is the definition of a producer in

24   terms of cable access contained in the PEG operating

1    procedures?

2        A    These particular ones I assume you are

3    asking about, right?

4        Q    Yes.

5            Let me ask you this:  Were there any

6    other ones that would have been in effect while

7    Samantha Fisher was the cable access employee in

8    Holbrook?

9        A    I am not sure if there might have been other

10   revisions.  It's in the earliest one, so it would be

11   in all of them.  It's on page 6.

12       Q    Which exhibit are you referring to?

13       A    No. 5 and No. 6 and No. 7.  It's on page 6

14   of one of them in terms of a definition.  The word

15   and things that are associated with it come up later

16   in the document as well, but the definition is there.

17       Q    At some point I believe you concluded that

18   Robert was the producer of the cooking show; is that

19   correct?

20       A    Correct.

21       Q    And was the definition you were using for

22   producer in arriving at that conclusion the

23   definition contained in these documents which have

24   been marked as Exhibits 5 through 7 inclusive?

1    A    It is.  It's not readily apparent, but I can

2    explain what I mean by that.

3    Q    Let me ask you this before you explain

4    yourself:  Was there any other definition of producer

5    that you applied to your conclusion about Robert

6    outside of these agreements?

7    A    Yes.  There is the television industry,

8    generally speaking, definition of what a producer is.

9    Q    And what is your understanding of what that

10   industry definition is?

11   A    It's what I mentioned earlier.  This would

12   be the person that was making the television show.

13   That's the easiest way for me to define it, as

14   opposed to a crew person who would also be making it,

15   but they are making the show through the use of

16   equipment.

17   Q    Where did you obtain that industry standard?

18   Is that something you got through your education or

19   through your work experience or through some document

20   that you may have reviewed?

21   A    It's the first two.  It's through my

22   education.  It's through experience.

23   Q    Could you direct me to anything in writing

24   where I would obtain this industry standard, any type

1  of document or textbook?

2      A    Besides this definition you mean?

3      Q    What I am understanding that you are telling

4  me about is something outside of these documents

5  which you have indicated is an industry standard.   I

6  am asking you is that in writing anywhere, and if so,

7  where would I find it?

8      A    Textbooks.  I don't know.  I don't have a

9  specific place for you to look.  In my education I

10  would have no doubt it's in a syllabus of a class.

11      Q    Do you recall what syllabus's class?

12      A    No, I have no memory.

13      Q    As you sit here today are you able to point

14  me to any source where I might obtain this

15  information regarding a TV industry standard of the

16  term "producer"?

17      A    I can't direct you to a specific book, but

18  you could use the internet, internet movie database

19  maybe.  It's not an esoteric term.  It's pretty

20  fairly well-known what a producer does as opposed to,

21  say, a director.

22      Q    Again I am asking you specifically is there

23  anywhere where I would be able to find it this in

24  writing?

1          MS. ALEXANDER-KROM:  Objection.

2      A    I can't do that.

3      Q    So anything else outside of the agreement,

4  before we go back to the agreement, that you used in

5  forming an opinion that Robert was not the producer

6  of the cooking show, other than the industry standard

7  and the PEG operating procedure?

8      A    Just the facts that Samantha told me about

9  what his tasks were, what his connection was.

10     Q    Did you use any information outside of the

11  industry standard as you understood it and the PEG

12  operating procedure in your definition of the term

13  "producer" as it applied to Robert?

14     A    No.

15     Q    So let's go back to the agreement.  I

16  believe you said that it was page 6.

17     A    Page 6 on all of them.

18     Q    On all of them?

19     A    Yes.

20     Q    Is the definition on page 6 of a producer

21  the same in all three agreements?

22     A    It appears to be exactly the same.

23     Q    Would you read into the record -- I believe

24  it's fairly short -- what the definition of a

1    A    Yes.

2    Q    That's the PEG Operating Procedures Revised

3  February 2001?

4    A    Correct.

5              MR. SCOTT:  Why don't we mark it as

6  the next exhibit in this case, please.

7              (Exhibit 8 marked for identification)

8    Q    Now Exhibit 8, being revised in February

9  2001, would have been in effect after Samantha Fisher

10 was terminated, correct?

11   A    Correct.

12   Q    I would ask you to again look inside that

13 document to see if the term "producer" is defined.

14   A    Yes, it is.

15   Q    What page is that on?

16   A    Page 6.

17   Q    And is the definition of "producer" in

18 Exhibit 8 different than the definition of "producer"

19 in Exhibits 5, 6, and 7?

20   A    Yes.

21   Q    And in what way is it different?

22   A    The core definition is still there, but it

23 has been expanded on to really spell out for people

24 what that entails to be a producer.

1    Q    Was the term "producer" in Exhibit 8 in any

2   way related to the situation involving Cooking

3   Creatively and the situation that you described when

4   Samantha Fisher was the cable access person or

5   employee in Holbrook?

6    A    I think the root of that question was in any

7   way connected?

8    Q    Correct.

9    A    I am sure it was.  The reason for all these

10  revisions are across that whole region that we have

11  of however many towns it is -- of course I only had a

12  portion of it -- whenever anything comes up that

13  becomes a controversy in the community, especially if

14  it becomes a controversy with the cable advisory

15  board, we will often tweak.  We don't change them as

16  much as we tweak or perhaps add clarifying language

17  so as to get over, you know, similar situations.

18           So it's very possible that at least in

19  part this grew out of the Holbrook situation, but I

20  am sure -- I will just say that.

21   Q    In fact the definition in the 2001 PEG, the

22  version that we have in Exhibit 8, went from one

23  sentence to an entire paragraph, correct?

24   A    Yes, with that same first one sentence.

1    Q    Other than the first one sentence, the

2  balance of the definition of a producer in Exhibit 8

3  would not have been available to Samantha Fisher in

4  the prior PEGs, which we have labeled as Exhibits 5,

5  6, or 7, correct?

6    A    Not correct.

7    Q    Where would she have found the balance of

8  the language in Exhibit 8 for the term "producer"?  I

9  am going to direct you to look at Exhibits 5, 6, and

10  7.  Tell me where you see the other language that's

11  in Exhibit 8.

12    A    You are not going to find a direct quote.

13  The document as a whole -- any one of these that

14  anyone would care to use, they all have the spirit of

15  this, of the principles of this.  It's not like

16  this -- I don't want to give the impression that this

17  paragraph was clipped and pasted onto the definition,

18  but the sense of it is throughout the document.

19  That's where the tweaks come in.

20            When we make revisions, sometimes it's

21  because the company's name changes.  Sometimes it's

22  because people aren't making themselves familiar

23  enough with the document, and so therefore we were

24  trying to help put the pieces together for them

1    sometimes in more than one place.  So this is not

2    going to be -- I can't direct you to a place and say,

3    See, this is here; we moved it.

4              What I can say is, if you know the

5    document, it's nothing new.  As an access

6    coordinator -- Samantha worked for us.  She of all

7    people should know that.  That was her job.

8    Q    She should have known the spirit of the

9    agreement, not the language of the agreement, is that

10   what you are saying?

11   A    She should have known both.  That's her job.

12   Q    How was she supposed to know the spirit of

13   the agreement if it's not expressed in the agreement

14   to the level of detail certainly that it's expressed

15   in Exhibit 8, which is an entire paragraph now of

16   many conditions that have been added to the

17   definition of a producer?

18   A    These documents are for the public.  These

19   are to educate the public.  These are not for the

20   employee to learn their job, although it can be used.

21   It's helpful as a tool for that.

22   Q    Are you saying that the term "producer" as

23   defined in the PEG operating procedures documents is

24   not the definition of a producer that an employee

1    would use?

2       A    No.  I am saying that the entire document

3    exists for the public who use our studios.  It is not

4    a handbook for an access coordinator to understand

5    what their job is.

6       Q    If I am a member of the public and I want to

7    know whether I am eligible to produce a cable access

8    show, where else would I go other than to the PEG

9    agreement to learn what the definition is of a

10   producer?

11      A    As a member of the public where would you

12   go?

13      Q    Correct.

14      A    If you want to have a relationship with our

15   company in using our studios, you really don't need

16   to go any further than this.  You could go to

17   college.  You could have conversation --

18              MS. ALEXANDER-KROM:  Just answer the

19   question.

20      Q    I am assuming a nonprofessional volunteer.

21   That would be somebody who doesn't have a lot of

22   experience in the TV cable media industry.  Wouldn't

23   I go to the PEG document to understand whether I can

24   be a producer or a crew member or any of these roles

1  correct?

2      A    Correct.

3      Q    So let's see if we can hold that for a

4  second.  Let's see if any of the earlier versions

5  have it.

6          (Pause)

7      Q    When did this incident happen with Gary in

8  the studio?

9      A    In November.

10     Q    Of 2000?

11     A    Yes.

12     Q    Let me show you Exhibit 7, which was the

13 revision effective September 2000, page 14, and see

14 if that helps.

15     A    Yes.

16     Q    I am not trying to direct you.  I am trying

17 to save time.

18     A    Yes.  I knew it existed.

19     Q    Does that seem to address conduct?

20     A    Volunteer standards of conduct, yes.

21     Q    Would Gary have been a volunteer at that

22 time?

23     A    Yes.

24     Q    Looking at page 14, is there anything in the

1  standards of conduct for nonemployees involving

2  appropriate professional and respectful behavior?

3      A    Yes.

4      Q    Violent behavior will not be tolerated, does

5  it say that?

6      A    Yes.

7      Q    Threatening or intimidating language?

8      A    Yes, it says that.

9      Q    Does it have a sentence about respect,

10 behavior that could be construed as threatening or

11 harassing?

12     A    Yes.

13     Q    Does it have a sentence about being

14 courteous and polite to others, including employees?

15     A    Yes.

16     Q    Other volunteers and guests of the facility?

17     A    Yes.

18     Q    Do you feel that Gary's conduct, if true, in

19 that incident you described was inappropriate under

20 the standards expressed in the exhibit, the PEG

21 operating procedure effective September 2000?

22     A    If true, yes.

23     Q    If true, he would have violated those

24 provisions, correct?

1       A    If true, yes.

2       Q    Did you have any reason to believe it wasn't

3    true?

4       A    I hadn't gotten all the facts.  I can't say

5    I had a reason -- I wasn't at that point yet.

6       Q    Do you feel that Samantha's failure to reset

7    the clock based on -- was it daylight savings time,

8    change of seasons?

9       A    Whatever happens at that time of year, yes.

10      Q    Did you ever discipline Gary or take any

11   action towards Gary for this incident?

12      A    I did not.

13      Q    In fact you never even fully investigated

14   the incident, did you, because you never talked to

15   Gary?

16      A    I didn't say I didn't talk to him.

17      Q    I believe you stated earlier you never

18   talked to Gary about the incident, at least that was

19   my understanding.

20      A    I may have said I didn't talk to him about

21   the incident.  I can't say I never talked to Gary.  I

22   had talked to Gary.

23      Q    About this incident in the studio with him

24   yelling at Samantha?

1      A     That I don't recall.

2      Q     I have approximately 2:25.  Do we need a

3   break?

4      A     Sure.

5                     (Short recess taken)

6      Q     Going back to the PEG documents,

7   specifically 5, 6 and 7, which appear to be the

8   relevant time period, was it your understanding from

9   these documents or any other source that a producer

10  had to be a resident of the town?

11     A     Yes.

12     Q     Could you show me where in any one or all

13  these agreements where it discusses residency as a

14  requirement?

15     A     Starting on page 6, when it says that a

16  producer is an access or an organizational user, that

17  refers to two other definitions.  One is access user.

18  One is organizational user.

19               I don't know if these are exactly the

20  same.  Let me take a moment.

21     Q     Why don't we use the one to start that says,

22  Revised September 2000.

23     A     That's No. 7.

24     Q     Is access user defined?

1    A    Yes.

2    Q    What page are you on?

3    A    The definition -- well, the definition of

4    access user is on page 3 of this particular one, but

5    the reference to residents comes before that.

6    Q    Okay.

7    A    I am looking for the earliest reference.

8    The bottom of this particular page, 2 of 26, says,

9    AT&T Broadband provides channel time, production

10   equipment, training free of charge to residents for

11   production.  Residents include town inhabitants and

12   employees, organizations, and agencies that serve the

13   town.  Any resident may request channel time for the

14   presentation of a program and use production

15   equipment to produce a program.  A resident must

16   demonstrate adequate knowledge the equipment or

17   receive training in its use or certification for its

18   use by AT&T Broadband staff.

19   Q    It was your opinion as of September 2000

20   that Robert was the producer of the cooking show in

21   Holbrook, correct?

22   A    It was not my full understanding in

23   September of 2000.

24   Q    Would the residency definition contained in

1    this document have applied through the end of

2    Samantha Fisher's employment if in fact her

3    employment ended November 21, 2000?

4         A    Yes, I am confident that's the case.

5         Q    Generally these documents are not revised

6.   within a period of a month or two?

7         A    Right.

8         Q    Now resident at the top of page 3 includes

9    not only town inhabitants but employees of

10   organizations and agencies serving the town, correct?

11        A    Correct.

12        Q    So if Robert had been an employee of an

13   organization or agency serving the town during the

14   time when he was involved with the cooking show, he

15   could have been a legitimate producer, correct?

16        A    Only if he was doing a program for that

17   agency.  The dog officer lives out of town, but he is

18   the Holbrook dog officer.  If wants to do a show

19   about adopting dogs, that would be okay.

20        Q    Where in here does it restrict the employee

21   of an organization or agency serving the town from

22   any other program other than that that involves that

23   agency?

24        A    Well, again I think I would have to go back

1    to -- I am sorry -- that a producer is an access or

2    organizational user.  This is on page 6.  Then a

3    little above that, An organizational user is defined

4    as any group, organization which has scheduled

5    facilities or equipment -- I am looking for the

6    answer to your question here.

7        Q     Sure.

8        A     That's not really clear.  It would have to

9    be for their show.  If you give me a moment to

10   look --

11       Q     Absolutely.  Take your time.

12            (Pause)

13       A     Page 12.  This may not be as clear as you

14   would like.  On page 12, as far as availability under

15   Part 4, Subsection A, No. 1, page 12, Equipment and

16   facilities are available to residents of the town and

17   representatives or employees of organizations and

18   agencies that serve the town, first come, first

19   served, on a nondiscriminatory basis.  Town residents

20   formally involved in a student internship program at

21   AT&T Broadband may use the equipment and facilities.

22            So it doesn't spell it out, but that

23   was the intent.

24       Q     That's part of the spirit that you have been

1    talking about of these documents?  It's not written

2    but --

3    　　　A　　Not --

4    　　　　　　　　MS. ALEXANDER-KROM:  Objection.

5    　　　A　　Not in this particular one that I can find.

6.   　　　Q　　Is it in the spirit of the document as you

7    have defined that term previously when we were

8    talking about producer and the changes to the term

9    in the later agreement?

10   　　　A　　Yes.  The employees knew that.

11   　　　Q　　I didn't mean to use the term "agreement."

12   I meant the PEG operating procedure.

13   　　　　　　　Do you know whether Robert was an

14   employee of an organization or agency serving the

15   town?

16   　　　A　　I think I found out that he worked for

17   The Holbrook Sun.

18   　　　Q　　I show you a document and ask you if you

19   have ever seen it before.

20   　　　A　　I have not.  I don't recognize this.

21   　　　Q　　How did you get information that he may have

22   been employed by The Holbrook Sun?

23   　　　A　　I think when Samantha was trying to lobby

24   for him to be considered the producer, that was one

1    of the lines of reasoning she used.

2        Q    In fact hypothetically, if he had been

3    employed by The Holbrook Sun writing a cooking

4    column, would that under at least the literal

5    language of the PEG document effective September 2000

6    qualify him to be a producer of a cooking show?

7        A    No.

8        Q    Why not?

9        A    Because The Holbrook Sun is not -- although

10   they may disagree because of what they do, they are

11   not an organization or agency that serves the town.

12   That phrase refers to municipal agencies or perhaps

13   federal or state level but not for, like, a donut

14   shop or somebody.  Just because someone works in the

15   town doesn't mean that's what that refers to.  That

16   was never our intent.

17       Q    So if there is a Boy Scout troop in the town

18   of Holbrook that meets at the local high school,

19   would that be an organization or agency serving the

20   town?

21       A    Meaning the Boy Scouts in Holbrook?

22       Q    Yes.

23       A    I would think so.

24       Q    Can you point to me in that particular

1    exhibit -- is it Exhibit 7?

2        A    Yes, 7.

3        Q    Could you show me where organization or

4    agency serving the town is defined in that document?

5        A    I am not sure if it does.  I could look.

6        Q    Sure.  Take your time.

7            (Pause)

8        A    There is a reference to government cable

9    casting, access -- this is the bottom of page 4 --

10   access for federal, state and local officials to

11   disseminate information to their constituents via

12   cable television.  This can done by officially

13   submitting video cassettes, et cetera.

14       Q    Do you maintain that that statement on

15   government cable casting is related to the definition

16   of a resident on page 3?

17       A    I maintain that it's a reference to

18   organizational user on page 6 and, yes -- I am

19   sorry -- page 3 at the top -- the phrase, Employees

20   of organizations and agencies that serve the town,

21   yes, I do.

22       Q    Going back to these meetings that you had

23   wherein the termination of Samantha Fisher was

24   discussed, I believe you stated that it was by mutual

1  charity event.

2                MS. ALEXANDER-KROM:  Let him ask the

3  questions.

4      Q    So did you receive a copy of this April 10,

5  2000 letter, which has been marked as Exhibit 9 --

6      A    Yes.

7      Q    -- at some point in time other than today?

8      A    Yes.

9      Q    And this letter appears to be actually a

10 letter of thanks to Samantha Fisher, correct?

11     A    Yes.  It is, yes.

12     Q    From Madeline Yusna, correct?

13     A    Yes, correct.

14     Q    Who is also a Media One employee, correct?

15     A    Yes, at that point.

16     Q    So the problem or the issue, as I understand

17 it, was Samantha's involvement with Chowda, with the

18 cooking show?

19     A    No.

20     Q    Maybe I am missing the point then.

21     A    There was no problem with this letter or the

22 fact she was being thanked.  The problem dealt

23 with -- it doesn't say when it was.  It makes a

24 reference to last year's Boston International Seafood

1   show, whenever that was.  On the following Monday of

2   that show, I got an email from Samantha enthused

3   about this opportunity that they go in and do this

4   show.

5             At the time, which all of this predates

6   April -- I don't know when it was but predating

7   this -- while it was great the cooking show got to do

8   this and all that, my concern was that instead of

9   giving them the equipment and signing it out, as you

10  would normally do, and sending them off to the show,

11  she went with them, worked on the show.  That was my

12  concern.

13      Q    How do you know that she went with them and

14  worked on the show?

15      A    She told me she did.

16      Q    What is it that you understand that she did

17  in terms of working on the show?

18      A    Her presence without being -- sometimes you

19  need to be present if, like, a van is rolling.  You

20  need to be there for technical support and all that,

21  but they didn't do that.  They didn't take a van.

22  There was no reason for her to be on the shoot.

23      Q    Now as a Media One employee, at least at

24  that time, was she prohibited from going to an event

1    where there was local access being filmed just to

2    observe the event or to observe the filming?

3        A    She wasn't prohibited from that, no.

4        Q    As I understand it, crossing the line, so to

5    speak, would be involvement with the production other

6.   than in a technical sense, is that fair to say?

7        A    That's one line.  The other is not letting

8    me know and giving me the heads-up that she was going

9    to do this.

10       Q    Do you know as you sit here today what, if

11   any, involvement she had in the production of last

12   year's seafood show, as it's referenced in this

13   letter?

14       A    As I sit here today, I just know she was at

15   the event with the crew.  I don't know what specific

16   tasks she performed.

17       Q    So per say, at least based on the knowledge

18   you have today, she might not have crossed that line

19   into involvement on this event?

20       A    She might not have crossed the line in

21   involvement in the production, but my concern was she

22   was there with the crew.

23       Q    Okay.  I want to focus in on your concern.

24   So you have no knowledge, is that correct, whether or

1  not she worked on the show, on the seafood show?

2      A    On this particular one I don't have any

3  knowledge.

4      Q    Did you know she was involved in the sense

5  of either being present or working on Chowda

6  referenced in this letter, whenever that would have

7  occurred?

8      A    I didn't know until after the fact.

9      Q    Again as you sit here today, do you have any

10  specific knowledge that she worked on the Chowda

11  production referenced in this letter?

12      A    This particular one?

13      Q    Yes.

14      A    No.  It's the same thing.

15      Q    By "the same thing" --

16      A    They went that weekend, and the group went

17  in to do the show, whoever actually did it, and they

18  shot the show.  Then Samantha took the tapes and

19  submitted them to Madeline for use in the Chowda

20  program.

21      Q    And Madeline was pretty happy to get the

22  tapes?

23      A    She was happy to have content.  So she was

24  thanking Samantha.

1    A    It's written.

2    Q    And is it present in any of the documents

3    that we have marked as exhibits, or is it contained

4    somewhere else so far as you know?

5    A    Oh, I don't know if it's in any of these.

6.   It's not in these.

7    Q    We also have the two booklets here.

8    A    It could be in this (indicating), page 9 of

9    Doing What's Right, Exhibit 3.  It makes a reference

10   to it.

11   Q    Could you read into the record what parts of

12   this exhibit on page 9 that you are referring to?

13   A    It's entitled, Communication with the media.

14   The company has designated certain spokespersons as

15   the only personnel authorized to discuss information

16   with people outside the company, such as the news

17   media and financial community.

18           Then in bold print:  If you are

19   contacted by members of the news media or financial

20   community, direct them to the spokesperson designated

21   for your business unit.

22   Q    So in what way did Samantha Fisher violate

23   that policy?

24   A    She allowed The Patriot Ledger reporter to

1  come into the Holbrook studio and interview the

2  cooking hosts without informing either Jennifer

3  Corey, the designated person directly, or without

4  doing it through me.  Either one would have been

5  fine.

6.      Q    What is your understanding of the manner in

7  which that interview, the media interview was set up?

8      A    I believe it related to the charity event

9  that had taken place or was going -- I think it had

10  taken place, and they were following up, doing a

11  story on the program.

12      Q    Do you believe that Samantha Fisher set up

13  the interview?

14      A    I don't know who set it up.

15      Q    Do you believe that she was contacted by the

16  media to do the interview?

17      A    You mean prior to it happening?

18      Q    Correct.

19      A    I don't know that.

20      Q    If someone is producing a cable access show,

21  do they have to get the cable company's permission to

22  talk with the media?

23      A    On our premises they do.

24      Q    Where does it say that in that policy?

1    A    This policy doesn't discuss public access.

2 This is directed towards the employee.

3    Q    Even towards the employee, even though you

4 stated you don't know what involvement Samantha

5 Fisher had in this interview, where does it say that

6 she should notify anyone if an interview is taking

7 place in the studio if she is not part of that

8 interview?

9    A    If you are contacted by members of the news

10 media, direct them to the spokesperson designated for

11 your business unit.

12    Q    You have just said you don't know whether

13 she was contacted or not by the media.

14    A    Prior to it. That's why I had asked if you

15 meant that. Once they are in the door, on the

16 premises, she should have acted.

17    Q    If she had acted, what effect would that

18 have had towards the interview taking place or not

19 towards the incident with Gary in the presence of the

20 media representative or any of the issues that later

21 became troublesome for the company or at least --

22    A    I need you to repeat the first part of that

23 question.

24    Q    Sure.

1          If the media just shows up, in effect

2    whether she notifies any other employee of the

3    company, in her case what difference would that have

4    made in what happened with Gary or in the newspaper

5    reporter writing about that?

6.        A    The difference would have been that we would

7    have known about it proactively, in advance or right

8    on the cusp of it happening, instead of after the

9    fact, and only because Robert Branczewski called me

10   about it.

11        Q    How soon after the interview did Robert

12   Branczewski call you?

13        A    The next day.

14        Q    As you sit here today, you don't know

15   whether or not Samantha Fisher knew in advance of

16   this interview or had any direct contact with the

17   reporter at any time either before or during the

18   interview, correct?

19        A    Correct.

20        Q    Could you state each and every fact on which

21   you base your opinion that she violated conflicts of

22   interest?

23        A    She allowed her boyfriend, a nonresident

24   producer -- sorry -- a nonresident, to be a producer

1        Other than the reporter showing up the

2   day that Gary came in and you finding out the next

3   day from Robert, what other occasions did Samantha

4   not notify you of media presence at the studio or

5   media involvement?

6        A    There were none that I knew of.

7        Q    On what other specific facts do you base

8   your conclusion that she violated conflicts of

9   interest?

10       A    Specific facts?  Prior to her being

11  terminated?

12       Q    Correct.

13       A    The difficulty that she was giving me in

14  trying to settle the issue of who was behind the

15  program, the fact that she wasn't forthcoming with

16  information, and then when we would settle on a

17  particular answer in terms of who was the producer,

18  there was still the push back on again, the fact that

19  Robert worked for The Holbrook Sun and trying to hold

20  onto the fact that Robert be the producer or find a

21  way to make him be the producer.

22       Q    That's based on your interpretation of the

23  PEG operating procedure relative to employees of

24  organizations or agents that serve the town, correct?

1    A    Correct.

2    Q    You couldn't point to me to any specific

3    aspect of that agreement where it defines

4    organizations or agencies that serve the town,

5    correct?

6    A    Well, it's right there on page 3 or 6.  I

7    forget the page.  It appeared -- I don't remember

8    which one we were using.

9    Q    I think we were using the September 2000.  I

10   believe it was 7.

11   A    The statement seemed -- when I say "seemed,"

12   in the context of 2000, it seemed evident enough that

13   residents included town inhabitants and employees of

14   organizations and agencies that serve the town.

15   Serving the town did not mean donut shops, car

16   washes, newpapers.

17   Q    You can't point to any specific language

18   that excludes a newspaper as being an agency or

19   organization that serves the town; is that correct?

20   A    Correct.

21              MS. ALEXANDER-KROM:  Can we take a

22   quick break?

23              MR. SCOTT:  Absolutely.

24              (Short recess taken)

1    Q    You are again looking at page 3 of

2    Exhibit 7, is that correct, definition of "resident"?

3    A    No, that's not the definition of resident.

4    Q    I am going to ask you to take a look -- I am

5    going to ask you to review the definition of

6.   residency, which is on page 3 of that agreement, and

7    also review the definition of access user, which I

8    think is on the following page.

9    A    It's on the same page I am looking at,

10   access user, that one there (indicating).

11   Q    Correct.  I am going to show you Exhibit 8,

12   which is the PEG procedures revised February 2001.  I

13   am going to ask you to look at the bottom of page 2,

14   top of page 3 and again review the statement on

15   page 2 relative to the definition of a resident and

16   the definition on page 3 of an access user.

17   A    Mm-hmm.

18   Q    Has the definition of a resident and

19   definition of an access user changed in the exhibit

20   which is the PEG which went into effect in February

21   of 2001 from Exhibit 7?

22   A    Yes.

23   Q    And more specifically defines a resident --

24   in fact why don't you read it into the record.  I

1    think it's one sentence.

2        A    Residents include the towns inhabitants and

3    employees of nonprofit organizations and municipal

4    agencies that serve the town.

5        Q    That would definitely, without question,

6.   exclude Robert, even if he was employed by

7    The Holbrook Sun and trying to produce a cable access

8    program in Holbrook if he was a nonresident?

9        A    Yes.

10       Q    There is no question on that document?

11       A    Correct.

12       Q    Which is the February 2001 PEG?

13       A    Yes.

14       Q    It's not clear in the prior document, is

15   that a fact?

16       A    Apparently it wasn't, yes, correct.

17       Q    In fact, as a result of the controversy in

18   the Town of Holbrook over who could be a producer and

19   the press that was generated from the cancellation of

20   the cooking show, isn't it fair to say that was the

21   impetus for the revision in the page in February of

22   2001 to add that language or clarify that language?

23                    MS. ALEXANDER-KROM:    Objection.    Go

24   ahead.

1      A     Holbrook would have been one of the towns

2    that would have been the impetus for it, absolutely.

3      Q     What about the definition of access user?

4    Can you read in the February 2001 PEG that

5    definition?

6.     A     Any qualified individual who is a resident

7    or employee of a nonprofit organization or of a

8    municipal agency that serve the town.

9      Q     That's fine.  That would clearly exclude

10   someone in Robert's situation if that definition had

11   been in effect in November of 2000, correct?

12     A     Yes, correct.

13     Q     So when you say that Samantha Fisher was in

14   violation of company policy in allowing Robert to

15   produce the show, based on comparing the two PEGs,

16   Exhibit 7 and 8, isn't it fair to say that it was at

17   best a gray area in the PEG which is represented as

18   Exhibit 7 as to whether or not Robert would have been

19   a producer under this agreement or -- I am sorry --

20   this procedure?

21            MS. ALEXANDER-KROM:  Objection.  Do

22   you understand the question?

23     A     Yes, I do.  Answer anyway, right?

24            MS. ALEXANDER-KROM:  Can you repeat

the question?

           MR. SCOTT:  Sure.  Would you read back the question, please.

           (Record road)

           MS. ALEXANDER-KROM:  Do you understand the question?

           THE WITNESS:  Yes.

           MS. ALEXANDER-KROM:  Okay.  You can answer it.

    A    Provided that the discussions with Samantha were about Robert being producer, because she maintained all along up until near the end that Robert was not the producer.  It was only when it came to light on I think it was November 13th that really it's not the boys and really it's not Brett Rouse who is the producer.  Really, Sam, let's be honest.  It's Robert who is the producer.

           Now if history was different and all along she was saying Robert is the producer but I thought he was able to be because of that, we would have had a whole obviously different scenario, but Robert was never presented as a producer.  It was only I who figured it out that really he is the producer.  He doesn't live in town.  If we had had

1  discussions and Samantha was unclear about what this

2  referred to, then we would have cleared that up.  If

3  there was a misconception on Robert's part and it was

4  all a misunderstanding, we would have worked through

5  that.  We weren't talking about Robert being the

6. producer.

7      Q    That wouldn't have obviated the problems or

8  the complaints with Gary, would it?

9      A    What wouldn't have?

10     Q    Whether or not Robert was the producer,

11 because Gary didn't like the cooking show; is that

12 correct?

13     A    That was my impression.

14     Q    Because of that, Gary became an issue with

15 you that you had to deal with on a recurring basis

16 relative to the cooking show, correct?

17     A    Yes, correct.

18     Q    What other facts are you aware of on which

19 you concluded that Samantha violated conflict of

20 interest?

21     A    There was information that was filtering

22 back to us, and when I say "us," I meant myself and

23 our government relations people through Alan Dunn.

24 So that, in other words, he was getting involved in

1    questioning this show and, quote, unquote,

2    cancellation of the show, which we believed was

3    because Samantha was feeding him information, fanning

4    the flames so to speak.

5        Q    What is your source of that conclusion that

6.   she was -- or belief that she was fanning the flames

7    so to speak or communicating with Alan Dunn?

8        A    Because the communications that Alan Dunn

9    had with us, he wasn't getting that information from

10   myself or from government relations.  There would

11   only be one source for that.

12       Q    This was after you had told Samantha to

13   inform everyone that the cooking show needed to come

14   to a close, correct?

15       A    Correct.

16       Q    So how do you know it wasn't Robert or the

17   boys or the parents or some other source that Alan

18   Dunn was basing his comment on the news articles?

19   What linkage did you draw to Samantha Fisher?

20       A    It would have been based on if it was phone

21   calls, what he was saying in his phone calls and/or

22   emails to government relations that would have led us

23   to believe that.

24       Q    What is it specifically that he said that

1    led you to that belief?

2        A    I don't recall the specifics today, but

3    that's how the conclusion was based then.

4        Q    You don't recall, but yet it was important

5    enough that it was one of the reasons why you

6.   terminated Samantha Fisher, is that what you are

7    saying?

8                    MS. ALEXANDER-KROM:  Objection.

9    That's not what he is saying.

10                    MR. SCOTT:  I am asking him.

11       A    No.

12       Q    What other facts did you base your

13   conclusion on that she violated conflict of interest?

14       A    I am not sure if I am repeating myself now.

15   I apologize if I do.

16       Q    I can tell you the list of what you have

17   given me.

18       A    Okay.

19       Q    Allowed Robert to produce the show -- I am

20   paraphrasing, not verbatim.  This is to give you the

21   list.  Did not give you prior notice of reporters.

22   This is greatly simplified.  This is my list.

23   Difficulties about the program and information being

24   fed to Alan Dunn.  I have four things.