# TAB TWO

1                                        Volume II
                                         Pages 1 to 91
2                                        Exhibits 12 to 34

3                    UNITED STATES DISTRICT COURT

4                      DISTRICT OF MASSACHUSETTS

5     _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
      SAMANTHA FISHER,
6                         Plaintiff(s),

7         v.                                Civil Action
                                            No. 0312321-GAO
8     AT&T BROADBAND,
                          Defendant(s).
9     _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

10

11              CONTINUED DEPOSITION OF ALBERT J. DUCHANEY,

12    a witness called by counsel for the Plaintiff, taken

13    pursuant to the applicable rules, before Diane L.

14    McElwee, Registered Merit Reporter and Notary Public

15    in and for the Commonwealth of Massachusetts, at the

16    LAW OFFICES of DAVID O. SCOTT, P.C., 200 Chauncy

17    Street, Mansfield, Massachusetts, on Wednesday,

18    April 6, 2005, commencing at 10:05 AM.

19

20

21                        _____

22              DIANE L. McELWEE, RPR, RMR
                      152 Seekonk Street
23              Norfolk, Massachusetts 02056
                Tel. and Fax -- 508-528-1055
24              e-mail -- dlmdepos@yahoo.com

1    A    I am not sure I understand the question.

2              MS. ALEXANDER-KROM:  Objection.

3    Q    Let me see if I can rephrase it.

4              What effect, if any, did the decision

5    to terminate the cooking show have on Samantha

6    Fisher's termination?

7    A    None.

8    Q    Did she take any actions that you recall in

9    opposition to the decision to end the cooking show?

10   A    No.

11   Q    Did you have any conversations with her

12   where she was resistant in any way to the termination

13   of the cooking show once the decision had been made?

14   A    No.

15   Q    Did you make the decision to end the cooking

16   show?

17   A    Yes.

18   Q    And what was the reason for your decision to

19   end the cooking show?

20   A    It was being produced by somebody who didn't

21   live in town.

22   Q    Do you remember when you made that decision?

23   A    I remember it being early in the month or in

24   the middle of the month of that November.

# TAB THREE

**Page 1**

[ 1]                                        Volume I
                                            Pages 1 to 38
[ 2]                                        Exhibits (None)

[ 3]                    UNITED STATES DISTRICT COURT

[ 4]                      DISTRICT OF MASSACHUSETTS

[ 5]     - - - - - - - - - - - - - - - -
[ 6]     SAMANTHA FISHER,
                         Plaintiff(s),
[ 7]          v.                               Civil Action
[ 8]     AT&T BROADBAND,                       No. 0312321-GAO
                         Defendant(s).
[ 9]     - - - - - - - - - - - - - - - -

[10]

[11]          DEPOSITION OF LOU RUSSO, a witness called by

[12]     counsel for the Plaintiff, taken pursuant to the

[13]     applicable rules, before Diane L. McElwee, Registered

[14]     Merit Reporter and Notary Public in and for the

[15]     Commonwealth of Massachusetts, at the LAW OFFICES OF

[16]     DAVID O. SCOTT, P.C., 200 Chauncy Street, Mansfield,

[17]     Massachusetts, on Wednesday, April 20, 2005,

[18]     commencing at 2:03 PM.

[19]

[20]

[21]                       _____

[22]              DIANE L. McELWEE, RPR, RMR
                      152 Seekonk Street
[23]              Norfolk, Massachusetts 02056
                  Tel. and Fax -- 508-528-1055
[24]              e-mail -- dlmdepos@yahoo.com

[25]

---

**Page 2**

[ 1]     PRESENT:

[ 2]          LAW OFFICES OF DAVID O. SCOTT, P.C.
              200 Chauncy St.
[ 3]          Mansfield, MA 02048
              by David O. Scott, Esq.
[ 4]          for the Plaintiff

[ 5]          MURTHA CULLINA, LLP
              99 High St.
[ 6]          Boston, MA 02110-2320
              by Laurie Alexander-Krom, Esq.
[ 7]          for the Defendant

[ 8]

[ 9]

[10]     Also present:

[11]          Samantha Fisher

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

---

**Page 3**

[ 1]                        I N D E X

[ 2]     _____

[ 3]     WITNESS:      DIRECT    CROSS    REDIRECT    RECROSS

[ 4]

[ 5]     Lou Russo

[ 6]       by Mr. Scott      4

[ 7]

[ 8]

[ 9]

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

---

**Page 4**

[ 1]                   P R O C E E D I N G S

[ 2]

[ 3]          MR. SCOTT:  Usual stipulations.

[ 4]

[ 5]     LOU RUSSO, a witness identified and sworn, was

[ 6]     examined and testified as follows:

[ 7]               DIRECT EXAMINATION

[ 8]     BY MR. SCOTT:

[ 9]     Q    State your name, please.

[10]     A    Lou Russo.

[11]     Q    I want to go over a couple of ground rules

[12]     which will help the deposition flow more smoothly.

[13]          I am going to be asking you some

[14]     questions.  If at any time you don't understand the

[15]     question or you need me to repeat it or rephrase it,

[16]     please indicate that to me, and I will do so.  If not

[17]     and you answer the question, I will assume you

[18]     understood it.

[19]          It's important that only one of us

[20]     speak at a given time.  So I will do my best to let

[21]     you answer fully, and if you would do your best to

[22]     let me complete my question before you answer.

[23]     Lastly, if you need a break for any reason -- I see

[24]     you have some water.  If you need to refill your cup

[25]

[1]    A    I was hired — I was promoted to manager of
[2]    community relations in the Brockton office in 1991.
[3]    Q    How long did you stay in that position?
[4]    A    About five years.
[5]    Q    What, if anything, did you do after that?
[6]    A    I was promoted to manager of government
[7]    affairs. That was in '96, '97. We transitioned
[8]    companies to Media One.
[9]    Q    At the time you were first hired as the
[10]    manager of government relations -- did you say
[11]    government affairs?
[12]    A    Started with community relations and then
[13]    became government affairs.
[14]    Q    Okay. Thank you. Was your employer Media
[15]    One?
[16]    A    Media One I believe came in around '97, and
[17]    I was community relations in '91, became government
[18]    affairs somewhere around '96.
[19]    Q    What, if any, positions did you hold after
[20]    government affairs?
[21]    A    I was promoted to director of government
[22]    affairs in 2003, government community relations.
[23]    Q    Could you briefly describe your job
[24]    responsibilities as the manager of government
[25]

[1]    affairs?
[2]    A    Sure. That was when I was beginning to
[3]    negotiate renewals with communities.
[4]    Q    Was that your primary function in that
[5]    position?
[6]    A    That and overseeing community relations to a
[7]    lesser degree.
[8]    Q    Did you have responsibility as a manager of
[9]    government affairs for certain towns, or how did that
[10]    work?
[11]    A    Yes. It was divided up by the region
[12]    responsibilities at the time.
[13]    Q    Do you recall in the years 1999 or 2000
[14]    whether or not you were responsible for the Holbrook
[15]    cable access studio in terms of your scope of
[16]    responsibility?
[17]    A    I was never -- let's see.
[18]        As manager of government affairs I no
[19]    longer had studio responsibilities, so the studio
[20]    management portion of my job ended.
[21]    Q    So in negotiating renewals, did you have a
[22]    territory regarding which towns you would negotiate
[23]    these renewals?
[24]    A    Yes, I did.
[25]

Page 11

[1]    Q    What was your territory, for lack of a
[2]    better word, around 1999, 2000?
[3]    A    Okay. That would have encompassed I think
[4]    about 17 or 20 communities. I am not quite sure of
[5]    the timeframe. That's because they grew over time.
[6]    It could have been somewhere between 17 and
[7]    21 communities.
[8]    Q    Was Holbrook, Massachusetts one of those
[9]    17 or 20 communities in that timeframe?
[10]    A    Yes, it was.
[11]    Q    At some point did you become aware of some
[12]    issues regarding Samantha Fisher and and/or a cooking
[13]    show in the town of Holbrook?
[14]    A    Oh, yes.
[15]    Q    When did you first become aware of that
[16]    issue?
[17]    A    Are you asking me a date?
[18]    Q    I am asking you -- let me phrase it this
[19]    way: Can you tell me what was the event that first
[20]    drew your attention to that situation?
[21]    A    Let me think back. It may have been from
[22]    the cable advisory chair, Alan Dunn, or it may have
[23]    been from internal PEG people, access people. I
[24]    don't recall specifically which at the time or what
[25]

Page 12

[1]    first triggered that. I don't know.
[2]    Q    Are you familiar with something called the
[3]    PEG access programming operating procedure?
[4]    A    Sure.
[5]    Q    How often is that document revised, if you
[6]    know?
[7]    A    Currently I don't know. I would say it
[8]    would change as often as something created a reason
[9]    to change it, which could have been any kind of
[10]    incident or any kind of clarity or any kind of
[11]    request from a community or any kind of instance, you
[12]    know, as you manage something and try to do a better
[13]    job at it.
[14]    Q    You stated that you first became aware of a
[15]    situation in Holbrook. You don't recall exactly how
[16]    it happened, whether it was through Alan Dunn or some
[17]    internal communication. What was it that you learned
[18]    that was going on relative to the town of Holbrook?
[19]    A    It would have been something that would have
[20]    impacted either our community relations efforts or
[21]    something to do with compliance and the license.
[22]    Q    Have you ever met an employee by the name of
[23]    Samantha Fisher?
[24]    A    Sure.
[25]

# TAB FOUR

**Yahoo! Mail for sahavah@yahoo.com**        Yahoo! - My Yahoo!    Options - Sign Out - Help

☑ Mail    ⬜ Addresses    📅 Calendar    📓 Notepad

Attachment View -- *Powered by* Outside In HTML Export

Back to Message





## AT&T BROADBAND'S PEG ACCESS PROGRAMMING

## OPERATING PROCEDURES (revised Septmber, 2000)

Introduction ..................................................................page 2

Definition of Terms ......................................................page 3

Program Scheduling & Cablecasting Procedures...................page 7

    Technical Standards................................................page 9

    Credits/Disclaimers/Labeling of Sensitive Material...........page 10

    Grants, Underwriting and Sponsorship.........................page 10

    Personal Profit/Commercial Use................................page 10

    Bicycled Tapes ...................................................page 11

Use of Facilities and Equipment.....................................page 12

    Volunteer Standards of Conduct................................page 13

    Portable equipment.............................................page 15

    Editing and Post Production....................................page 16

Program Planning Proposal............................................page 17

Program Content.......................................................page 17

Prohibitions............................................................page 18

AT&T Broadband Program Rights..................................................page 19

Political and Issue Oriented Programs.................................................page 19

**Grievances/Public Record...............................................................page 20**

**Bulletin Board Announcements.........................................................page 21**

**Access User's Agreement...............................................................page 22**

## I.  **INTRODUCTION**

**AT&T Broadband Vision Statement:**

AT&T Broadband is committed to the creation and delivery of Interactive Broadband products and services that enable people to simplify and enhance their lives. We help our customers reach around the corner and around the globe. Our superior customer service reflects our dedication to an environment that embraces community, opportunity, integrity, and courage. We value balance in life and work, and believe our services contribute to that goal. Our excitement for the future ignites a passion for excellence and a belief that all things are possible.

AT&T Broadband provides communities with a wonderful opportunity for volunteers by providing Public, Education, and Government Access facilities and equipment. Our goal is to provide a safe and professional work environment for all. To achieve this we want to inform you of what is expected of you and what you may expect in your relationship with AT&T Broadband.

**At AT&T Broadband:**

- We believe that it is important for all of us to treat each other with consideration and respect.
- Our work environment models safety for our employees, vendors, customers, and volunteers.
- The behaviors that we demonstrate reflect the attitude of respect and dignity for all.
- We work together in a team environment.
- We require the proper use of equipment, computer systems, and our facilities.

**Therefore, the following standards of conduct have been developed. Violation of any one of these standards can result in loss of privileges to AT&T Broadband facilities. AT&T Broadband has full authority and discretion to deny access privileges as and when it deems appropriate.**

AT&T Broadband provides channel time, production equipment, training and technical assistance free of charge to residents for the production and presentation of noncommercial programs.

Residents include the town's inhabitants and employees of organizations and agencies that serve the town. Any resident may request channel time for the presentation of a program. In order to use production equipment to produce a program, a resident must demonstrate adequate knowledge of the equipment or receive training in its use and certification by AT&T Broadband's staff.

AT&T Broadband's staff will provide training in the use of equipment and customary studio and field production, editing and post production along with technical assistance in program production. AT&T Broadband's staff is not available to serve as a production crew to make programs or cover events. AT&T Broadband's staff will assist residents in assembling production crews from among trained and qualified volunteers.

## II. DEFINITION OF TERMS

**Access Channels** -- Channels set aside by the cable operator for use by the public, educational institutions, municipal government, or for lease on a nondiscriminatory basis.

**Access User** -- Any qualified individual who has scheduled equipment, facilities or channel time in his/her own name.

**Alphanumeric Keyboard** - A keyboard that allows communications with a computer in letters and numbers.

**Bicycled Tape** -- A videotape that is not produced in the town, rather, it is pre-produced and prerecorded material that is shipped or brought to operators for PEG Access use.

**Broadband Communications System** -- Frequently used as a synonym for cable television. It can describe any technology capable of delivering multiple channels and services.

**Cable Television System** -- A broadband communications system, capable of delivering programming and information services from a set of centralized antennas, generally by coaxial cable, to a community. Other integration includes fiber optics and satellite and microwave communications.

**Candidate, legally qualified for office** -- Any person who has publicly announced candidacy by formal declaration and meets the legal qualifications for office, and these conditions:

For all offices other than U.S. President and Vice President:

· **If running for nomination in a primary election:** (a) qualifies for a place on the primary ballot, or (b) has publicly committed to a write-in campaign, is eligible for write-in, and is making "substantial showing" of candidacy.

· **If running for nomination through convention or caucus:** (a) start of convention is less than 90 days away and (b) candidate is making a "substantial showing" of candidacy.

· **If seeking election to office:** (a) has qualified for a place on the ballot or (b) has publicly committed to write-in campaign, is eligible for write-in, and is making "substantial showing" of candidacy.

For office of U.S. President and Vice President:

· If running for nomination by any means: (a) has qualified for the primary or presidential ballot; or (b) has made a "substantial showing" of bona fide candidacy; or (c) has met the "10-state" rule, by qualifying for nomination or election in 10 states.

· If seeking election to office: (a) has qualified for a place on the ballot; or (b) has publicly committed to a write-in campaign, is eligible for write-in, is making "substantial showing" of write-in, and is making a "substantial showing" of candidacy; or (c) has met the "10-state" rule, by qualifying for nomination or election in 10 states.

**CG (Character Generator)** -- Device which electronically displays letters and numbers on the television screen.

**Channel Capacity** -- Maximum number of channels that a cable system can carry simultaneously.

**Copyright** -- The exclusive right to the material contained in a program. The right covers reproduction, publishing, and broadcasting of information.

**Crew** -- Those persons working with the producer and/or user to assist in the production of programming.

**Dedicated Channel** -- Any channel reserved for a particular use.

**Distant Signals** -- Television channels from another market imported and carried locally by a cable television system.

**Downstream** - The flow of signals from the cable system headend through the distribution network to the subscriber.

**Earth Station** -- Structure, referred to as a "dish", used for receiving and/or transmitting those electromagnetic signals coming from or going to a satellite.

**Educational Access** -- Channel time reserved for noncommercial educational access programming.

**Federal Communications Commission (FCC)** -- The U.S. governmental agency established in 1934 to regulate electronic communications. The FCC succeeded the Federal Radio Commission.

**First Time User** -- An individual or organization which has not used either the equipment, facilities or channel time during the preceding twelve months.

**Franchise** -- Contractual agreement between a cable operator and a governmental body that defines the rights and responsibilities of each in the construction and operation of a cable system within a specified geographical area.

**Government Cablecasting** - Access for federal, state and local officials to disseminate information

to their constituents via cable television. This can be achieved by the official submitting videocassettes to the cable operator, sending abridged newsletters for display on a system's alphanumeric channel, or participating in interview programs on access channels.

**Hardware** -- Equipment involved in the production, storage, distribution or reception of electronic signals. (Examples are headend, coaxial cable network, amplifiers, television receivers and production equipment, like cameras and videotape recorders).

**Headend** -- Electronic control center of the cable system. This is the site of the receiving antenna and the signal processing equipment essential to proper functioning of a cable system.

**HUBS** -- Distribution centers where signals are taken from a master feed and transmitted over cable to subscribers.

**Independent** -- Individually owned and operated cable television system; not affiliated with an MSO.

**Institutional Network** --A network which is operated in conjunction with a cable TV system, which is designed to satisfy the needs of schools, businesses, or government.

**Interconnect** -- Connection of two or more cable systems by microwave, fiber, coaxial cable, or satellite, so that programming or advertising may be exchanged, shared or simultaneously viewed.

**Issuing Authority** -- Governmental body responsible for specifying the terms of a franchise, awarding it, and regulating its operation. While the franchising authority is usually a local city or county body, some areas are regulated exclusively on the state level.

**Leased Access**-- Any channels made available by the operator for a fee.

**Libel** -- A written or oral statement that conveys and unjust characterization.

**Local Origination** -- Cable programming entirely planned and produced by AT&T Broadband staff and/or a pre-produced videotape that is cablecast on a channel controlled by the cable operator.

**Local Origination Programming** -- Programming in which program planning and production is carried out by the AT&T Broadband staff. There may be volunteer input on ideas and involvement in the production, but editorial control and responsibility rests with the cable operator.

**Local Signals** -- Over-the-air broadcast signals available within the Grade B contour of a community; usually carried on a cable system's basic tier of programming.

**MSO (Multiple System Operator)** -- Company that owns and operates more than one cable television system.

**Narrowcasting** -- Delivery of programming that addresses a specific need or highly focused audience.

**Obscene Material** -- Material which fits the legal definition of obscene or indecent material under local and state laws.

.../ShowLetter?box=Inbox&MsgId=8691_604917_6907_857_186237_0&bodyPart=2&YY=5 12/6/2000

**Ordinance** -- Enabling legislation passed by a local government to establish guidelines for the franchising process.

**Organizational User** -- Any group or organization which has scheduled equipment, facilities or channel time in its name. An organizational user is subject to the same weekly facility and channel limitations as individual users, whether one or several individuals book time in the name of the organization.

**PEG** -- Refers to "public, educational and governmental" access channels; i.e. PEG channel(s).

**Penetration** -- Ratio of the number of cable subscribers, or pay-TV subscribers, to the total number of households passed by the system.

**Producer** -- An access or organizational user that is responsible for the production of a PEG Access cable program.

**Programming** -- the news, entertainment, information resources and educational presentations carried on a cable system or broadcast by a radio or television station. Such programming can originate at the local, PEG Access, regional, or national level.

**Public Access** -- That channel time, available on a first-come, first served, nondiscriminatory basis, specifically for noncommercial access programming by residents or local organizations.

**Public Access Programming** -- Programming produced by volunteers using AT&T Broadband facilities and equipment. When an access user brings in a prerecorded tape for cablecast, it is also considered public access. In both these instances, AT&T Broadband, by federal law, may not edit or control content This programming must be noncommercial.

**Regular User** -- An individual or organization which has used either the equipment, facilities or channel on two or more occasions in the four week period prior the current request for scheduling. Regular users also include those who have used the facilities or channel on a monthly basis for at least six months prior to the current request for such use.

**Satellite** -- Device located in a geostationary orbit above the earth which receives transmissions from separate points and retransmits them to cable systems over a wide area.

**Slander** -- A false oral statement that is meant to defame a person's character.

**Staff** -- Those employed by AT&T Broadband to assisting in the production of programming. Usually limited to training, technical support and assistance with the use of AT&T Broadband equipment.

**Subscriber** -- Customer paying a monthly fee to cable system operators for the capability of receiving a diversity of programs and services.

**Upstream** - The flow of data or voice signals from a remote origination point through the cable system to the headend.

**Users** -- Producers, crew or interns who are using any of AT&T Broadband's facilities.

**Volunteer** -- Those residents of the crew who volunteer their services for assisting in the production of programming.

## III. PROGRAM SCHEDULING & CABLECASTING

Channel and facility times are provided on a first-come, first-serve, nondiscriminatory basis to any resident user filing a request, in accordance with the operating rules. It should be understood, however, that since this is a shared resource, specific channel time and equipment use requests cannot always be guaranteed.

### A. Scheduling Channel Time

1. Requests for channel time shall be processed on a fair and equitable, nondiscriminatory basis, subject to the availability of cablecasting equipment and channel time.

2. Channel time scheduling requests must be submitted at least eight (8) weeks prior to the desired cablecast date. At the discretion of staff, and if the desired time slot is available, the eight-week submission rule may be waived to allow the timely cablecasting of newsworthy events.

3. Users must sign a program indemnification agreement and channel request form before any program is cablecast. Approval by the Access Coordinator is required.

4. If scheduling and equipment allows, a taped program may be repeated any time during any weekly period, for a total of two (2) cablecasts. All programs are cablecast no more than twice within a given week. First-run programs have priority over reruns in slot scheduling.

5. AT&T Broadband reserves the right to use designated access channels for other purposes, where time on the designated channels has not been scheduled for use for designated access purposes in accordance with these procedures.

6. **Requests for consistent time slots**: Program series will be allocated at the discretion of the staff, provided ample time remains available for other programming requests and if the following conditions are met:

   a. PEG Access volunteers produce the material.

AT&T Broadband Access Channel. A wrap around is considered to be an opening, or introduction, to the material and an outro, or ending, which is edited at the start and end of each episode. The wrap must be produced and edited by the resident at the facility serving his town. He must then edit it onto each episode of a series. AT&T Broadband staff will train access users but will not produce nor perform the wrap arounds. The wrap around need not be moving video nor include the resident/sponsor himself. A graphic will suffice. (see page 17 section V. part B for information on use of copyrighted material).

1. Any public non-profit organization or state agency can bicycle tapes with only one representative as the sponsor. The organization does not have to be based in the town but the representative must be able to furnish proof of its non-profit status and that it does serve that town. i.e. One representative must be a resident of the town who will sign an Access User's Agreement (pages 22/23). He will not be required to put a wrap-around on the tape(s).

## IV. USE OF FACILITIES AND EQUIPMENT

AT&T Broadband's channels and facilities are a medium for statement and free speech. No individual will be denied the use of the facilities on the basis of race, sex, age, physical disability, religion or political belief. It is hoped that PEG Access residents, organizations and institutions will utilize this resource as a means to produce a wide variety of programs.

### A. Eligibility to Production Equipment and Facilities

1. Availability -- Equipment and facilities are available to residents of the town and representatives or employees of organizations and agencies that serve the town on a first-come, first-serve, and nondiscriminatory basis. Non residents formally enrolled in a student internship program at AT&T Broadband may use the equipment and facilities.

2. Minors -- eligible persons who are minors must have written permission from their parent or guardian to use facilities and the parent or guardian must sign a release accepting responsibility for scheduled production equipment. A responsible adult shall execute the necessary assurances that authorization has been obtained concerning the use of any equipment by a minor and/or appearance of any minors on a cablecast program. Such adults shall be responsible for liability resulting from the use of equipment or an appearance by a minor.

3. User must have successfully completed the applicable AT&T Broadband workshop or demonstrate, on a standardized equipment use test, the basic operation of the requested video equipment. If the user has not used the equipment or facilities for more than one year, re-certification may be required.

4. Users must sign an Access User's Agreement before using the facilities. This

document certifies that the user has read, understands, and will abide by the operating rules, and agrees to be solely responsible for the content of any programs produced or scheduled for cablecast.

**B. General Facility Policies** -- AT&T Broadband is pleased to provide facilities, equipment and channel time for television productions. In return, we ask that users obey all of the franchise requirements and procedures adopted by AT&T Broadband regarding channel and facility use.

1. No smoking, food or beverages are allowed in the control room or studio area, or mobile studio, at any time. Smoking is not permitted in these areas.

1. Anyone found to be under the influence of alcohol or drugs, or carrying a weapon of any kind, will be removed from the premises and will result in the loss of privileges.

**B. General Facility Policies (continued)**

3. Abide by safety guidelines. Copies are available.

4. There will be no use of phones or other office equipment, unless granted permission by AT&T Broadband staff.

5. Users are responsible for loss or damage to facilities and equipment due to negligence or abuse.

6. Users of AT&T Broadband equipment, or studio and post-production facilities will not change wiring, patch bays or components without staff permission or supervision. No attempt should be made to work on or repair equipment. <u>Any damage caused in this manner will be charged to the user. A loss of privileges will result from such equipment abuse. Access Users of AT&T Broadband equipment should report any defects or problems to the staff.</u>

7. Users that are found to be misusing or abusing the equipment may be asked to repeat training, testing and/or be subject to loss of privileges.

8. Staff may waive certain equipment and facility rules at his/her discretion.

### C. Volunteer Standards of Conduct for Non-AT&T Broadband Employees

1. Safety First. Keep yourself safe, keep others safe, keep company property and equipment safe at all times. Endangering the safety of oneself, others or company property will not be tolerated.

1. Appropriate, professional, and respectful behavior is expected at all times. Violent behavior will not be tolerated. This includes threatening or intimidating language, any form of physical assault such as striking or manhandling another person, or fighting. Weapons, or any objects resembling weapons, are prohibited while on or in AT&T Broadband facilities.

1. Respect. Behavior that could be construed as threatening or harassing (including sexual harassment) toward fellow volunteers, customers, vendors, or employees will not be tolerated.

1. Honesty and accuracy. Dishonesty with employees or falsifying records or any other access related documents will not be tolerated.

1. Be courteous and polite to others, including employees, other volunteers, and guests of the facility.

1. Drug free environment. Carrying and/or being under the influence of drugs or alcohol at anytime while on AT&T Broadband property or while using AT&T Broadband Access equipment is prohibited.

### C. Volunteer Standards of Conduct for Non-AT&T Broadband Employees

### (continued)

1. Smoking is permitted only in designated outdoor areas.

1. Company property and facilities are accessible only with proper authorization. This includes, but is not limited to, company e-mail, vehicles, and production and editing equipment.

1. Respect for and appropriate use of company property and equipment, including vehicles, and production and editing equipment is required.

1. Privileges may be lost for engaging in any other conduct that AT&T Broadband Group deems unacceptable.

**D. General Rules for Equipment Use** - Public, Educational, government Access programming is created by volunteers and depends on the participation by many active, trained volunteers who use video communication tools in order to independently reflect their ideas. Staff will assist residents in assembling production crews from among trained and qualified volunteers. AT&T Broadband does not provide video production services for residents or organizations, except in special circumstances. Organizations planning to do programs on a regular basis are encouraged to form a television production committee, which AT&T Broadband will then train. Technical assistance and advice for the production of programming will be provided on a first-come, first-serve, nondiscriminatory basis in accordance with the policies of AT&T Broadband.

1. Users must be properly certified and have completed all required planning and equipment forms approved by the staff before the equipment, van or facilities will be scheduled.

1. Users should only identify themselves as access users, not as employees or staff of AT&T Broadband, Inc.

1. Reservations for equipment or facility use may be made up to one month in advance and should be made at least one week in advance. Confirmation of facility and equipment reservations, forty-eight (48) hours in advance, is strongly recommended. Reservations can be made with staff:

   a. In person, or

2. Message request should be submitted one (1) week prior to the desired starting date.

3. General messages that do not pertain to a specific event will be shown as long as possible depending on available space. In order for the message to be renewed, a request must be re-filed every six (6) months.

1. All other rules regarding limitations on content for programming apply to

bulletin board announcements.



# ACCESS USER'S AGREEMENT

1. I have read and am thoroughly familiar with the contents of the AT&T Broadband operating rules.

2. I will be responsible for the content of program material to be taped and/or cablecast by me and agree that such program material will not include.

   a. any obscene or profane material;

   b. any lottery or lottery information;

   c. any advertising

   d. any direct or indirect solicitation of money, except where exempted under these rules;

   e. any material which constitutes libel, slander, invasion of privacy or publicity rights, violation of trademark or copyright, or which might violate any local, state or federal law.

3. Before cablecasting materials for which I am responsible, I will obtain all approvals, clearances, licenses, etc. for the use of those program materials; including, but not limited to, approvals by broadcast stations, networks, sponsors, music licensing organizations, copyright owners, performer's representatives, persons appearing in the program material and any other approvals that might be necessary in order to cablecast the program on AT&T Broadband.

4. I indemnify and hold AT&T Broadband harmless against any claims arising out of any use of the program material that I cablecast or any breach of this User's Agreement; including, but not limited to any claims in the nature of libel, slander, invasion of privacy or publicity rights, noncompliance with applicable laws and unauthorized use of copyrighted material.

5. I agree that I shall not represent myself or any other person involved in programming as an employee, representative or agent of AT&T Broadband, unless specifically authorized by AT&T Broadband to do so.

6. I understand that I may be liable for the costs of any repair or replacement of equipment or materials resulting from damage beyond reasonable wear and tear through normal use, misuse, or theft while such equipment or materials are in my possession or control. I understand the penalties that apply if equipment or materials are not returned on time. I also indemnify AT&T Broadband against any damage or liability incurred while using the equipment.

7. I shall not use AT&T Broadband channels, equipment or facilities for any financial gain or other commercial purposes. I understand that programming produced with AT&T Broadband's equipment or facilities shall be for the benefit of the community .

8. I understand that violation of the terms of this statement is grounds for forfeiture of the right to use AT&T Broadband equipment facilities or channel time.

9. I have been instructed on how the access equipment I am borrowing is to be safely handled, including the storage and lifting of it in and out of my vehicle and/or dwelling.


SIGNED _____ DATE: _____

       (Parent or Guardian, if minor)

PRINT NAME: _____

FULL ADDRESS:_____

TELEPHONE:_____

DRIVER'S LICENSE OR OTHER ID:_____

(STAFF USE ONLY)

APPROVED BY:_____ DATE: _____

# Program sponsors FILL OUT REVERSE SIDE


# SPONSOR INFORMATION


PRINT NAME: _____

FULL ADDRESS:_____

.../ShowLetter?box=Inbox&MsgId=8691_604917_6907_857_186237_0&bodyPart=2&YY=5 12/6/2000

TELEPHONE: _____

DRIVER'S LICENSE OR OTHER ID:_____

    ORGANIZATION: _____

(IF NON-PROFIT)

    TAX ID#: _____

(NON-PROFIT)

PROGRAM TITLE: _____

PROGRAM DESCRIPTION:_____

PROGRAM LENGTH: _____

CHECK ONE: SPECIAL____WEEKLY SERIES____BIWEEKLY____MONTHLY____

(STAFF USE ONLY)

APPROVED BY:_____DATE:_____

**Back to Message**

Yahoo! Messenger - Send instant messages to your online friends.

Address Book · Alerts · Auctions · Bill Pay · Bookmarks · Briefcase · Broadcast · Calendar · Chat · Classifieds · Clubs · Companion · Experts · Games · Greetings · Home Pages · Invites · Mail · Maps · Member Directory · Messenger · My Yahoo! · News · PayDirect · People Search · Personals · Photos · Shopping · Sports · Stock Quotes · TV · Travel · Weather · Yahooligans · Yellow Pages · more...

Privacy Policy- Terms of Service · Guidelines
Copyright © 1994-2000 Yahoo! Inc. All rights reserved.