# TAB FIVE

# AT&T BROADBAND'S PEG ACCESS PROGRAMMING OPERATING PROCEDURES (revised February, 2001)

Introduction .......................................................................................... page 2

Definition of Terms ............................................................................. page 3

Program Scheduling & Cablecasting Procedures............................... page 8
Technical Standards............................................................................ page 10
Credits/Disclaimers/Labeling of Sensitive Material........................... page 11
Grants, Underwriting and Sponsorship............................................... page 11
Personal Profit/Commercial Use......................................................... page 11

Bicycled Tapes .................................................................................... page 12

Use of Facilities and Equipment.......................................................... page 13
Volunteer Standards of Conduct.......................................................... page 14

Portable equipment.............................................................................. page 16
Editing and Post Production................................................................ page 17
Program Planning Proposal................................................................. page 18

Program Content.................................................................................. page 19
Prohibitions......................................................................................... page 19
AT&T Broadband Program Rights...................................................... page 20
Political and Issue-Oriented Programs................................................ page 20

Grievances/Public Record................................................................... page 21

Bulletin Board Announcements........................................................... page 22

Access User Agreement....................................................................... pages 23/24

Town-specific franchise requirements are separate and distinct from AT&T Broadband's PEG access programming operating procedures.




# I. INTRODUCTION

**AT&T Broadband Vision Statement:**

AT&T Broadband is committed to the creation and delivery of Interactive Broadband products and services that enable people to simplify and enhance their lives. We help our customers reach around the corner and around the globe. Our superior customer service reflects our dedication to an environment that embraces community, opportunity, integrity, and courage. We value balance in life and work, and believe our services contribute to that goal. Our excitement for the future ignites a passion for excellence and a belief that all things are possible.

AT&T Broadband provides communities with a wonderful opportunity for volunteers by providing public, education, and government access facilities and equipment. Our goal is to provide a safe and professional work environment for all. To achieve this, we want to inform you of what is expected of you and what you may expect in your relationship with AT&T Broadband.

**At AT&T Broadband:**
- We believe that it is important for all of us to treat each other with consideration and respect.
- Our work environment models safety for our employees, vendors, customers, and volunteers.
- The behaviors that we demonstrate reflect the attitude of respect and dignity for all.
- We work together in a team environment.
- We require the proper use of equipment, computer systems, and our facilities.

**Therefore, the following standards of conduct have been developed. Violation of any one of these standards can result in loss of privileges to AT&T Broadband facilities. AT&T Broadband has full authority and discretion to deny access privileges as and when it deems appropriate.**

AT&T Broadband provides channel time, production equipment, training, and technical assistance free of charge to residents for the production and presentation of noncommercial programs.

Residents include the town's inhabitants and employees of non-profit organizations and municipal agencies that serve the town. Any resident may request channel time for the presentation of a program. In order to use production equipment to produce a program, a resident must demonstrate adequate knowledge of the equipment or receive training in its use and certification by AT&T Broadband's staff.

AT&T Broadband's staff will provide training in the use of equipment and customary studio and field production, editing, and post production, along with technical assistance in program production. AT&T Broadband's staff is not available to serve as a production crew to make programs or cover events for volunteer producers. AT&T Broadband's staff will assist residents in assembling production crews from among trained and qualified volunteers.

## II. DEFINITION OF TERMS

**Access Channels** -- Channels set aside by the cable operator for use by the public, educational institutions, municipal government, or for lease on a nondiscriminatory basis.

**Access User** -- Any qualified individual who is a resident, or an employee of a non-profit organization, or of a municipal agency that serves the town. He must successfully complete training and sign the Access User Agreement. Then he may schedule equipment, facilities and/or channel time in his own name. (Such an individual may or may not be a producer. See that entry for more information.)

**Alphanumeric Keyboard** -- A keyboard that allows communications with a computer in letters and numbers.

**Bicycled Tape** -- A videotape that is not produced in the town, rather, it is preproduced and prerecorded material that is shipped or brought to operators for PEG Access use.

**Broadband Communications System** -- Frequently used as a synonym for cable television. It can describe any technology capable of delivering multiple channels and services.

**Cable Television System** -- A broadband communications system, capable of delivering programming and information services from a set of centralized antennas, generally by coaxial cable, to a community. Other integration includes fiber optics and satellite and microwave communications.

**Candidate, legally qualified for office** -- Any person who has publicly announced candidacy by formal declaration and meets the legal qualifications for office, and these conditions:

For all offices other than U.S. President and Vice President:
- **If running for nomination in a primary election:** (a) qualifies for a place on the primary ballot, or (b) has publicly committed to a write-in campaign, is eligible for write-in, and is making "substantial showing" of candidacy.
- **If running for nomination through convention or caucus:** (a) start of convention is less than 90 days away and (b) candidate is making a "substantial showing" of candidacy.
- **If seeking election to office:** (a) has qualified for a place on the ballot or (b) has publicly committed to write-in campaign, is eligible for write-in, and is making "substantial showing" of candidacy.

For office of U.S. President and Vice President:
- **If running for nomination by any means:** (a) has qualified for the primary or presidential ballot; or (b) has made a "substantial showing" of bona fide candidacy; or (c) has met the "10-state" rule, by qualifying for nomination or election in 10 states.
- **If seeking election to office:** (a) has qualified for a place on the ballot; or (b) has publicly committed to a write-in campaign, is eligible for write-in, is making "substantial showing" of write-in, and is making a "substantial showing" of candidacy; or (c) has met the "10-state" rule, by qualifying for nomination or election in 10 states.

**CG (Character Generator)** -- Device which electronically displays letters and numbers on the television screen.

**Channel Capacity** -- Maximum number of channels that a cable system can carry simultaneously.

**Copyright** -- The exclusive right to the material contained in a program. The right covers reproduction, publishing, and broadcasting of information.

**Crew** -- Access Users working with the producer and/or Access User to assist in the production of programming. AT&T Broadband understands it may be difficult for resident producers to find adequate crew from within the town. Crew members that are non-residents must fulfill all the requirements of AT&T Broadband's PEG access programming operating procedures, including signing the Access User Agreement, but excluding the residency requirement, under conditions set forth and approved by AT&T Broadband. It is expected that non-resident crew members will be an exception and will constitute a very small minority. Non-residents involved in any programs shall be limited to the production crew only. Only residents of communities served by AT&T Broadband, set forth in Cable Licenses signed in those communities, may be producers.

**Dedicated Channel** -- Any channel reserved for a particular use.

**Distant Signals** -- Television channels from another market imported and carried locally by a cable television system.

**Downstream** -- The flow of signals from the cable system headend through the distribution network to the subscriber.

**Earth Station** -- Structure, referred to as a "dish", used for receiving and/or transmitting those electromagnetic signals coming from or going to a satellite.

**Educational Access** -- Channel time reserved for noncommercial educational access programming.

**Federal Communications Commission (FCC)** -- The U.S. governmental agency established in 1934 to regulate electronic communications. The FCC succeeded the Federal Radio Commission.

**First Time Access User** -- An individual or non-profit organization which has not used either the equipment, facilities, or channel time during the preceding twelve months.

**Franchise** -- Contractual agreement between a cable operator and a governmental body that defines the rights and responsibilities of each in the construction and operation of a cable system within a specified geographical area.

**Government Cablecasting** -- Access for federal, state, and local officials to disseminate information to their constituents via cable television. This can be achieved by the official submitting videocassettes to the cable operator, sending abridged newsletters for display on a system's alphanumeric channel, or participating in interview programs on access channels.

**Hardware** -- Equipment involved in the production, storage, distribution, or reception of electronic signals. (Examples are headend, coaxial cable network, amplifiers, television receivers, and production equipment, like cameras and videotape recorders.)

**Headend** -- Electronic control center of the cable system. This is the site of the receiving antenna and the signal processing equipment essential to proper functioning of a cable system.

**HUBS** -- Distribution centers where signals are taken from a master feed and transmitted over cable to subscribers.

**Independent** -- Individually owned and operated cable television system; not affiliated with an MSO.

**Institutional Network** -- A network which is operated in conjunction with a cable TV system, which is designed to satisfy the needs of schools, businesses, or government.

**Interconnect** -- Connection of two or more cable systems by microwave, fiber, coaxial cable, or satellite, so that programming or advertising may be exchanged, shared, or simultaneously viewed.

**Issuing Authority** -- Governmental body responsible for specifying the terms of a franchise, awarding the franchise, and regulating its operation. While the franchising authority is usually a local city or county body, some areas are regulated exclusively on the state level.

**Leased Access** -- Any channels made available by the operator for a fee.

**Libel** -- A written or oral statement that conveys an unjust characterization.

**Local Origination** -- Cable programming entirely planned and produced by AT&T Broadband staff and/or a pre-produced videotape that is cablecast on a channel controlled by the cable operator.

**Local Origination Programming** -- Programming in which program planning and production is carried out by the AT&T Broadband staff. There may be volunteer input on ideas and involvement in the production, but editorial control and responsibility rests with the cable operator.

**Local Signals** -- Over-the-air broadcast signals available within the Grade B contour of a community; usually carried on a cable system's basic tier of programming.

**MSO (Multiple System Operator)** -- Company that owns and operates more than one cable television system.

**Narrowcasting** -- Delivery of programming that addresses a specific need or highly focused audience.

**Obscene Material** -- Material which fits the legal definition of obscene or indecent material under local and state laws.

**Ordinance** -- Enabling legislation passed by a local government to establish guidelines for the franchising process.

**Organizational Access User** -- Any member of a non-profit organization with a tax identification number that serves the town, or employee of a municipal agency that serves the town, that has scheduled equipment, facilities, or channel time in its name. An organizational Access User is subject to the same weekly facility and channel limitations as individual Access Users, whether one or several individuals book time in the name of the organization.

**PEG** -- Refers to "public, educational, and governmental" access channels; i.e. PEG channel(s).

**Penetration** -- Ratio of the number of cable subscribers, or pay-TV subscribers, to the total number of households passed by the system.

**Producer** -- An access or organizational user that is responsible for the production of a PEG Access cable program. The producer is AT&T Broadband's main contact for a program and must be a resident of the town served by the facility. While a program may involve many Access Users working on the same production, the producer agrees to be personally and financially responsible for all liabilities arising from safety and other violations of AT&T Broadband's PEG access programming operating procedures by themselves or any members of the production crew. (In the case of a minor, his parent or guardian assumes all responsibility for program content and other liability outlined in AT&T Broadband's PEG access programming operating procedures and the Access User Agreement).

**Programming** -- the news, entertainment, information resources, and educational presentations carried on a cable system or broadcast by a radio or television station. Such programming can originate at the local, PEG Access, regional, or national level.

**Public Access** -- That channel time, available on a first-come, first-served, nondiscriminatory basis, specifically for noncommercial access programming by residents or local non-profit organizations.

**Public Access Programming** -- Programming produced by volunteers using AT&T Broadband facilities and equipment. When an access user brings in a prerecorded tape for cablecast, it is also considered public access. In both these instances, AT&T Broadband, by federal law, may not edit or control content. This programming must be noncommercial.

**Regular Access User** -- An Access User that has used either the equipment, facilities, or channel on two or more occasions in the four-week period prior the current request for scheduling. Regular Access Users also include those who have used the facilities or channel on a monthly basis for at least six months prior to the current request for such use.

**Satellite** -- Device located in a geostationary orbit above the earth which receives transmissions from separate points and retransmits them to cable systems over a wide area.

**Slander** -- A false oral statement that is meant to defame a person's character.

**Staff** -- Those employed by AT&T Broadband to train and provide supervision in the use of AT&T Broadband equipment.

**Subscriber** -- Customer paying a monthly fee to cable system operator for the capability of receiving diverse programs and services.

**Training** -- Evidence of proper training is the ability to complete a task without staff assistance. The requirements for completing training are defined by the Access Coordinator as applicable to the program under production.

**Upstream** -- The flow of data or voice signals from a remote origination point through the cable system to the headend.

**Users** – See Access User.

**Volunteer** – Access Users who volunteer their services for assisting in the production of programming.

Reimbursements for profit making programs are as follows:

a. Negotiating a percent of sales or net income; or

b. Charging an hourly fee for the actual value of the equipment and facility time; or

c. Trading services, i.e. a media artist working under a grant trades teaching specialized video production classes in return for using the facility.

## H. Bicycled Tapes

Videotape that is not produced in the town, rather, it is preproduced and prerecorded material that is shipped or brought to operators for PEG Access use. Bicycled tapes must be strictly noncommercial in nature, and technical and production quality must be high. Locally produced programs will receive priority scheduling.

1. A program must have a locally produced wrap around in order to be played on an AT&T Broadband Access Channel. A wrap around is considered to be an opening, or introduction, to the material and an outro, or ending, which is edited at the start and end of each episode. The wrap must be produced and edited by the resident at the facility serving his town. He must then edit it onto each episode of a series. AT&T Broadband staff will train access users but will not produce or perform the wraparounds. The wraparound need not be moving video or include the resident/sponsor himself. A graphic will suffice. (See page 18 section V. part B for information on use of copyrighted material).

2. Any public, non-profit organization, or state agency can bicycle tapes with only one representative as the sponsor. The non-profit organization does not have to be based in the town but the representative must be able to furnish proof of its non-profit status and that it does serve that town, i.e. one representative must be a resident of the town who will sign an Access User Agreement. He will not be required to put a wraparound on the tape(s).

12

## IV. USE OF FACILITIES AND EQUIPMENT

AT&T Broadband's channels and facilities are a medium for expression and free speech. No individual will be denied the use of the facilities on the basis of race, sex, age, physical disability, religion, or political belief. It is hoped that PEG Access residents, non-profit organizations, and institutions will utilize this resource as a means to produce a wide variety of programs.

### A. Eligibility to Use Production Equipment and Facilities

1. Availability -- Equipment and facilities are available to residents of the town and representatives or employees of non-profit organizations and agencies that serve the town on a first-come, first-served, and nondiscriminatory basis. Non-residents formally enrolled in a student internship program at AT&T Broadband may use the equipment and facilities.

2. Minors -- Eligible persons who are minors must have written permission from their parent or guardian to use AT&T Broadband facilities. The parent or guardian must sign the Access User Agreement, accepting responsibility for scheduled production equipment and/or program material if the minor is the producer of a program. A responsible adult shall execute the necessary assurances that authorization has been obtained concerning the use of any equipment by a minor and/or appearance of any minors on a cablecast program. Such adults shall be responsible for liability resulting from the use of equipment or an appearance by a minor.

3. Access User must have successfully completed the applicable AT&T Broadband workshop or demonstrate, on a standardized equipment use test, the basic operation of the requested video equipment. If the Access User has not used the equipment or facilities for more than one year, re-certification may be required.

4. Access Users must sign an Access User Agreement before using the facilities. This document certifies that the Access User has read, understands, and will abide by the operating rules, and agrees to be solely responsible for the content of any programs produced or scheduled for cablecast if they are the producer of record.

### B. General Facility Policies -- AT&T Broadband is pleased to provide facilities, equipment, and channel time for television productions. In return, we ask that Access Users obey all of the franchise requirements and AT&T Broadband's PEG access programming operating procedures regarding channel and facility use.

1. No smoking, food, or beverages are allowed in the control room or studio area, or mobile studio, at any time.

2. Anyone found to be under the influence of alcohol or drugs, or carrying a weapon of any kind, will be removed from the premises. This will result in the loss of privileges.

13

B. **General Facility Policies (continued)**

    3. Abide by safety guidelines. See Section C below.

    4. There will be no use of phones or other office equipment, unless granted permission by AT&T Broadband staff.

    5. Access Users are responsible for loss or damage to facilities and equipment due to negligence or abuse.

    6. Access Users of AT&T Broadband equipment, or studio and post-production facilities, will not change wiring, patch bays, or components without staff permission or supervision. No attempt should be made to work on or repair equipment. <u>Any damage caused in this manner will be charged to the Access User. A loss of privileges will result from such equipment abuse. Access Users of AT&T Broadband equipment should report any defects or problems to the staff.</u>

    7. Access Users that are found to be misusing or abusing the equipment may be asked to repeat training, testing and/or be subject to loss of privileges.

    8. Staff may waive certain equipment and facility rules at their discretion.

C. **Volunteer Standards of Conduct for Non-AT&T Broadband Employees**

    1. Safety First. Keep yourself safe, keep others safe, keep company property and equipment safe at all times. Endangering the safety of oneself, others, or company property will not be tolerated.

    2. Appropriate, professional, and respectful behavior is expected at all times. Violent behavior will not be tolerated. This includes threatening or intimidating language, any form of physical assault such as striking or manhandling another person, or fighting. Weapons, or any objects resembling weapons, are prohibited while on or in AT&T Broadband facilities.

    3. Respect. Behavior that could be construed as threatening or harassing (including sexual harassment) toward fellow volunteers, customers, vendors, or employees will not be tolerated.

    4. Honesty and accuracy. Dishonesty with employees or falsifying records or any other access-related documents will not be tolerated.

    5. Be courteous and polite to others, including employees, other volunteers, and guests of the facility.

14

C. **Volunteer Standards of Conduct for Non-AT&T Broadband Employees** (continued)

6. Drug-free environment. Carrying and/or being under the influence of drugs or alcohol at any time while on AT&T Broadband property, or while using AT&T Broadband Access equipment, is prohibited.

7. Smoking is permitted only in designated outdoor areas.

8. Company property and facilities are accessible only with proper authorization. This includes, but is not limited to, company e-mail, vehicles, and production and editing equipment.

9. Respect for, and appropriate use of, company property and equipment, including vehicles, and production and editing equipment is required.

10. Privileges may be lost for engaging in any other conduct that AT&T Broadband Group deems unacceptable.

D. **General Rules for Equipment Use**

Public, educational, government access programming is created by volunteers and depends on the participation of many active, trained volunteers who use video communication tools in order to independently reflect their ideas. Staff will assist residents in assembling production crews from among trained and qualified volunteers. Non-profit organizations and municipal agencies planning to do programs on a regular basis are encouraged to form a television production committee, which AT&T Broadband will then train. Training for the production of programming will be provided on a first-come, first-served, nondiscriminatory basis in accordance with the AT&T Broadband's PEG access programming operating procedures.

1. Access Users must be properly certified and have completed all required planning and equipment forms approved by the staff before the equipment, van or facilities will be scheduled.

2. Access Users should only identify themselves as Access Users, not as employees or staff of AT&T Broadband, Inc.

3. Reservations for equipment or facility use may be made up to one month in advance and should be made at least one week in advance. Confirmation of facility and equipment reservations, forty-eight (48) hours in advance, is strongly recommended. Reservations can be made with staff:

    a. in person, or
    b. by phone.

**AT&T | BROADBAND**

# ACCESS USER AGREEMENT

1. I have read and am thoroughly familiar with the contents of the AT&T Broadband operating rules.

2. If the program producer, I will be responsible for the content of program material to be taped and/or cablecast by me and agree that such program material will not include.

    a. any obscene or profane material;
    b. any lottery or lottery information;
    c. any advertising
    d. any direct or indirect solicitation of money, except where exempted under these rules;
    e. any material which constitutes libel, slander, invasion of privacy or publicity rights, violation of trademark or copyright, or which might violate any local, state or federal law.

3. Before cablecasting materials for which I am responsible as producer, I will obtain all approvals, clearances, licenses, etc. for the use of those program materials; including, but not limited to, approvals by broadcast stations, networks, sponsors, music licensing organizations, copyright owners, performer's representatives, persons appearing in the program material and any other approvals that might be necessary in order to cablecast the program on AT&T Broadband.

4. I indemnify and hold AT&T Broadband harmless against any claims arising out of any use of the program material that I cablecast or any breach of this Access User Agreement; including, but not limited to, any claims in the nature of libel, slander, invasion of privacy or publicity rights, noncompliance with applicable laws and unauthorized use of copyrighted material.

5. I agree that I shall not represent myself or any other person involved in programming as an employee, representative, or agent of AT&T Broadband, unless specifically authorized by AT&T Broadband to do so.

6. I understand that I may be liable for the costs of any repair or replacement of equipment or materials resulting from damage beyond reasonable wear and tear through normal use, misuse, or theft while such equipment or materials are in my possession or control. I understand the penalties that apply if equipment or materials are not returned on time. I also indemnify AT&T Broadband against any damage or liability incurred while using the equipment.

7. I shall not use AT&T Broadband channels, equipment, or facilities for any financial gain or other commercial purposes. I understand that programming produced with AT&T Broadband's equipment or facilities shall be for the benefit of the community.

8. I understand that violation of the terms of this statement is grounds for forfeiture of the right to use AT&T Broadband equipment facilities or channel time.

9. I have been instructed on how the access equipment I am borrowing is to be safely handled, including the storage and lifting of it in and out of my vehicle and/or dwelling.

SIGNED _____ DATE: _____
        (Parent or Guardian, if minor)
PRINT NAME: _____
FULL ADDRESS: _____
TELEPHONE: _____
DRIVER'S LICENSE OR OTHER ID: _____
PROGRAM TITLE: _____
(STAFF USE ONLY)
APPROVED BY: _____ DATE: _____

**PROGRAM SPONSORS AND PRODUCERS FILL OUT REVERSE SIDE**

23

# PRODUCER/SPONSOR INFORMATION

PRINT NAME: _____

FULL ADDRESS: _____

TELEPHONE: _____

DRIVER'S LICENSE OR OTHER ID: _____

ORGANIZATION: _____
(IF NON-PROFIT)

TAX ID#: _____
(NON-PROFIT)

PROGRAM TITLE: _____

PROGRAM DESCRIPTION: _____

PROGRAM LENGTH: _____

CHECK ONE: SPECIAL____WEEKLY SERIES____BIWEEKLY____MONTHLY____

SIGNED _____ DATE: _____
(Parent or Guardian, if minor)

(STAFF USE ONLY)
APPROVED BY:_____DATE:_____

# TAB SIX


MediaOne
116 Main Street
Watertown, MA 02472

Phone    617 923.8610
Fax      617 923.2452


This is Broadband. This is the way.

April 10, 2000

Ms. Samantha Fisher
MediaOne
169 North Franklin Street
Holbrook, Ma. 02342

Dear Samantha:

At long last I am returning the videotapes from Boston Cooks, as well as a copy of the segment from Chowdah and a copy of last year's Boston Internation Seafood Show. Please extend my thanks again to Robert, Peter, and Bret for sharing the footage with our program. I hope Cooking Creatively had as much fun with the footage as we did! I plan to air the segment again, and will let you what the airdates are once they are confirmed.

As you know, all of us at MediaOne Three Network work with fairly tight resources, so it's always nice when community producers have material that we can incorporate into our shows. I hope that if any other producers in your system have footage to share in the future, you will give me a "heads-up," and I'll be happy to take a look at what they've got. It's a win-win opportunity for all of us to further leverage our resources for the benefit of our viewers.

Thanks again, and best wishes to the crew of Cooking Creatively!

Sincerely,

Madeline Yusna
Executive Producer of Entertainment/Variety Programming
MediaOne Three Network

MAY
cc: Al Duchaney, Jim McKeever



# TAB SEVEN

Unknown

| | |
|---|---|
| From: | Duchaney, Al |
| Sent: | Thursday, November 02, 2000 11:57 AM |
| To: | Copithorne, Wendy; Russo, Lou; Fitzgerald, Joyce |
| Subject: | FW: Holbrook and the Patriot Ledger |
| Sensitivity: | Confidential |

EXHIBIT NO. 28
4-6-05
D. McElwee

Hi,

I am forwarding this to you all to keep you up to date on the possible press explosion in Holbrook.

Joyce, there is also a secondary issue here with the way a staff member was treated by a member of the public. It has been overshadowed by all of the static detailed below. (I admit I am not feeling all that compassionate at this point because I have only heard the story from Robert and Sam's point of view and this is all rooted in basically the same problem Sam has always invited with this show. That aside however, she was quite upset by the whole encounter.

*Al Duchaney*
AT&T Broadband
Area Access Supervisor, South of Boston
386 Washington St.
Norwell, MA 02061
ph: (781) 659-1235 x1004
fx: (781) 659-9855

-----Original Message-----

| | |
|---|---|
| From: | Duchaney, Al |
| Sent: | Thursday, November 02, 2000 11:51 AM |
| To: | Khoury, Jennifer |
| Cc: | Fisher, Samantha |
| Subject: | Holbrook and the Patriot Ledger |

Hi, Jennifer.

Please excuse the length of this message. I want to alert you to a potential issue that might arise in Holbrook and want you to have as complete a picture as possible.

The access channel playback automation system clock was not correctly set back an hour this week and so Holbrook resident Gary Machaby's program, "The Living Word", played out at 6pm instead of 7. Samantha Fisher saw it on the air at the time but did not realize it was only six o'clock.

Well, come 7pm, the show was not on the air and Gary came down to the studio yell at Sam. (I don't know why he didn't call at 7:01). She apologized a number of times for the error and fixed the timing right then. She offered to send it out immediately (approx. 7:10) and he said (shouted?) that it should go out at 7:30. So Sam set it up for 7:30pm and Gary stayed in the control room waiting for the time to come around and make sure it actually went out, and then he left.

**The reason I am sending this to you** is because *at the very same time* the hosts of another access show, (hosted by out-of-towners, but crewed by Holbrook kids), were being interviewed by a Patriot Ledger reporter by the name of Jessica. (I am working on a last name

1

and phone number). The reporter wondered to one of the hosts she was talking with: 'How do they handle such conflicts'? This was because Gary started shouting and making a general scene about the Cooking show and Sam's 'special interest' in it.

Gary has a long standing bias against the other program because of Sam's affiliation with Robert Branczewski, her boyfriend, one of the hosts of the program. That and the fact that he is not a resident creates suspicion in Gary's mind that Sam 'works' on Robert's show and provides special assistance to his show that she does not provide to his. That could certainly be a legitimate concern except that Gary has been assured numerous times by me and Sam that the program is produced and crewed by Holbrook kids. We do not require hosts, or other talent be residents as long as the person(s) ultimately responsible for the program live in town. Sam does not work on the crew of the show. She supervises the production just as she supervises Gary's.

Sam should not have allowed the interview to take place on our property (in hindsight) but Jessica was there to watch the cooking show production for her story. When the production was canceled that night due to Halloween an interview alone took place. She is planning to come back next week to see an actual taping. My concern is that she might try talking to Sam about what happened "last Tuesday" and try digging for a story on preferential treatment of non-residents, etc. Next Tuesday is also the election so she may not show up, but you never know what story is going to come out the upset she witnessed. I am not sure if she spoke to Gary or plans to. I have not heard from Gary myself either.

If I can fill in any of the gaps, please let me know. Sam can be reached at (781) 767-2315.


*Al Dudxaney*
AT&T Broadband
Area Access Supervisor, South of Boston
386 Washington St.
Norwell, MA 02061
ph: (781) 659-1235 x1004
fx: (781) 659-9855

2