UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 03-12321-GAO

SAMANTHA FISHER,
Plaintiff

v.

AT&T BROADBAND,
Defendant.

MEMORANDUM AND ORDER
March 31, 2006

O'TOOLE, D.J.

**I.     Introduction**

Samantha Fisher worked for AT&T Broadband[1] from the summer of 1997 until her termination on November 21, 2000. She has filed a three-count complaint against AT&T, alleging wrongful termination and employment discrimination on the basis of her sex in violation of Mass. Gen. L. ch. 151B and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"). AT&T has moved for summary judgment on all counts, arguing (1) that Fisher has provided no evidence, direct or circumstantial, that she was terminated because she is female and (2) that her wrongful termination claim must fail because her employment was terminable at will and that to the extent that the claim is based on the same facts and allegations as her claim for discrimination, it is preempted by Mass. Gen. L. ch. 151B.

---

[1] Fisher was first hired by U.S. West Media Group, later named MediaOne of Massachusetts, Inc., which was later acquired by AT&T Broadband. Her employer will generally be referred to herein as "AT&T" or the "Company."

**II.     Undisputed Facts**

The following facts do not appear to be subject to genuine dispute:

The Company provides cable television services. Fisher was first hired by the Company as a Production Assistant in the summer of 1997. At that time she signed an "Employee Agreement" that expressly stated that she was to be an employee-at-will. (MediaOne Offer Letter and Employee Agreement, Def.'s Tab 4; Fisher Dep. Tr. 24-25.). She acknowledged at the time that she had received and reviewed the Company's employee handbook and a document entitled "Doing What's Right: Business Integrity and Ethics at MediaOne Group" (Def.'s Tabs 5 and 6, Fisher Dep. Tr. 129). Approximately one year later, Fisher became a Community Access Coordinator, working for the Company thirty hours per week in the Whitman/Hanson studio and ten hours per week at the studio in West Bridgewater. In her new role, it was Fisher's responsibility to coordinate the use of the community access studios by local residents, train them in the use of the equipment, and provide technical support when needed. She was to supervise production of the programs at the studios but was not to perform any actual work on them. In addition, she was responsible for enforcing the Company's rules with respect to the studios, including those which required producers of shows to be residents of the town.

While working at the West Bridgewater studio, Fisher became romantically involved with Robert Branczewski, who filmed a show called "Cooking Creatively" at that location. Fisher's supervisor, Vicki Carabello, later noticed that the timesheets Fisher and a coworker had been submitting demonstrated that they were "spending an inordinate amount of time working on 'Cooking Creatively.'" She reminded both Fisher and her coworker that they were not supposed to be working on the show.

In January or February of 1999, the original producer of "Cooking Creatively," Michelle Miller (a West Bridgewater resident), left the show. In February, Carabello met with Branczewski and Fisher and informed them that because Branczewski was not a resident of West Bridgewater, he could no longer produce the show in the West Bridgewater studio. According to Carabello, after the show was cancelled, Fisher assisted in the removal of the cooking set, even though it was not part of her job description.

During that same meeting, Carabello again warned Fisher that Access Coordinators were not allowed to work on community access programs. She also informed Fisher that the residency requirement meant that Branczewski could not film at the Hanson/Whitman studio either. However, she provided Branczewski with the contact information for the studio in Brockton, where he resided at the time, and called the studio to confirm that he would be able to film the show there.

In April 1999, AT&T transferred Fisher to the Holbrook community access studio. According to Fisher, she was transferred in part to prevent a coworker, Brian Liss, from harassing her.[2] Approximately six weeks later, "Cooking Creatively" began filming in the Holbrook studio. While neither Branczewski nor his co-host lived in Holbrook, Fisher repeatedly assured her new supervisor, Al Duchaney, that the show met the AT&T residency requirements because five local high school boys were the "producers" of the show.[3]

---

[2] The plaintiff has provided no evidence that any harassment was gender-based.

[3] She also apparently argued, at various times, that even if Branczewski was the producer of "Cooking Creatively" he qualified as a "resident" of Holbrook under the applicable definition, which treated "employees of organizations and agencies that serve the town" as "residents." Branczewski wrote a cooking column for the local newspaper, the Holbrook Sun, from approximately May 1999 to December of 2000.

After "Cooking Creatively" began filming in the Holbrook studio, Duchaney received a complaint from Gary Machaby, the producer and host of another cable access program that filmed there. Machaby informed Duchaney that a stove had been installed in the studio and that the cooking set interfered with the production of his show, "The Living Word." When Duchaney went to inspect the Holbrook studio, he found that "Cooking Creatively" had installed a full kitchen set (stove, countertops, cabinets, a sink and refrigerator). The set took up approximately two-thirds of the studio (Duchaney Aff. ¶ 4), although it was apparently designed so that it could be pushed back in the studio to allow other programs to tape (Fisher Dep. Tr. 100-101, 145). Duchaney also discovered that Fisher had permitted Branczewski to hire an electrician to install a 220 volt electrical line into the studio, without the permission of either AT&T or the Town, which owned the building. (Fisher Dep. Tr. 84-88, 148-151). Fisher did not use the AT&T provider or check to see if the electrician was certified. (Fisher Dep. Tr. 84-88, 148-151).

Duchaney discussed what he had learned with Wendy Copithorne, his supervisor, and with Bobbi Sym, the Company's Regional Human Resources Director, both female. On August 31, 1999, Duchaney issued Fisher a final written warning for her conduct. See MediaOne Personnel Action Report (Duchaney Aff. Ex. C). At the end of the warning, Duchaney made the following statement: "I have expressed to [Fisher] that I subscribe to a policy of 'no surprises management.' And I do not expect this kind of independent action to be taken ever again. The consequences arising from such a course will likely end in discharge from the company." Id. Fisher signed the warning, acknowledging that she had read it.

Over the course of the next year, Duchaney became increasingly concerned about the degree of Fisher's involvement with the show. (Duchaney Aff. ¶ 6). Duchaney claims that his concerns

4

arose as a result of (1) complaints that Fisher was working on the cooking show, (2) information obtained from Vicki Carabello about prior events at the West Bridgewater Studio, (3) Fisher's attendance at a weekend shoot where the cast and crew of "Cooking Creatively" attended the Third Annual Boston Cooks Show and conducted interviews with participating chefs, and (4) the extent of Fisher's involvement in the planning and production of a charity event put on by "Cooking Creatively." While Fisher had sought and received Duchaney's permission to work on the charity event, he said he was not informed that Fisher and "Cooking Creatively" were the organizers of the event, and he was surprised to later learn that Branczewski had sent a letter to the Superintendent of the Holbrook schools requesting use of the high school gymnasium for the event, placing his signature over the Company's name.

Fisher was later present in the Holbrook studio as Branczewski was being interviewed by a reporter from the Quincy Patriot Ledger about the charity event that had recently taken place. The employee handbook in effect at the time stated that it was the Company's policy to respond to all media requests through designated spokespersons, and that any employee who had not been designated as a spokesperson should direct all media requests to his or her supervisor. Fisher contends that she did not violate the policy because it was targeted at requests for interviews with Company employees, not cable access hosts or producers. Duchaney and the Company believed that Fisher should not have allowed the interview to take place on Company property and that, at a minimum, she should have notified her supervisor when she learned it was taking place.

Duchaney only learned of the interview after the fact, when Branczewski, not Fisher, called to report an unrelated incident that had occurred while the interview was taking place. Machaby had come to the studio, very upset because his show, "The Living Word," was not broadcast as

5

scheduled, apparently because the clocks had not been reset when daylight savings time ended. He began yelling and was verbally abusive toward Fisher. The reporter, who was still present, apparently wondered aloud how the Company handled such conflicts. E-mails in evidence demonstrate that the Company was concerned about the negative publicity that might arise as a result of the reporter's presence in the studio during the confrontation.

Soon thereafter, Duchaney requested a meeting with Fisher to discuss "Cooking Creatively." Duchaney states that, as a result of that discussion, it became apparent to him that the high school boys were not the producers of "Cooking Creatively" and that, contrary to Fisher's prior representations, Branczewski was the actual producer of the show. Duchaney apparently based this conclusion on his assessment that Branczewski was making most of the decisions regarding the show.[4] Duchaney informed Fisher at that meeting that because Branczewski was not a resident of Holbrook, the show would have to cease production in the Holbrook studio by the end of November. When Fisher and Branczewski met with the high school boys who worked on "Cooking Creatively" the next day, however, it was decided (it is unclear exactly how or by whom) that production would cease immediately.

---

[4] Duchaney claims that, when asked at that meeting, Fisher identified Branczewski as the person who picked out the recipes, made the decision as to when the show was going to run, and decided what guests would appear on the show. (Duchaney Aff. ¶ 13). Fisher and Branczewski continue to maintain that the boys were the actual producers, picking the recipes and the co-host(s) (who were friends or acquaintances of Branczewski's), (Fisher Dep. Tr. 71, 75-76), and that even if Branczewski were the producer, he met the "resident" requirement because he wrote a column for the Holbrook Sun.

Fisher does not appear to dispute that the show's premise and title were the same as they had been in West Bridgewater; that Branczewski and/or his co-host paid for and installed the show's set and obtained a Holbrook post office box in the name of the show; that Branczewski made the decision to do the interviews at the Third Annual Boston Cooks Show and "negotiated" with Harold Helmer for his appearance at the "Cooking Creatively" charity event, and that Branczewski purchased the food and equipment used during the weekly taping of the show.

The Company began to receive complaints from the community about the reasons given for the show's cancellation. Fisher was again asked to meet with Duchaney on November 16, this time in the presence of Copithorne, to discuss "Cooking Creatively" and how its cancellation had been handled. During that meeting, Duchaney recalls Fisher telling him that the boys quit the show when she informed them that, because they were minors, their parents needed to be involved with the show.[5] Duchaney and the Company allege this "miscommunication"[6] generated negative publicity for the Company and complaints from the Holbrook Cable Advisory Board.

Following the November 16 meeting, Duchaney and Copithorne met with Bobbi Sym (Regional Director of Human Resources), Michael Leone (Department Head), R.B. Lerch (acting Vice President), and Joyce Fitzgerald (Human Resources) to discuss the situation. As a group, they decided that Fisher's employment with the Company should be terminated because (1) she had violated the Company's conflict of interest policy by allowing her personal relationship with Branczewski to interfere with her professional responsibilities and (2) she had violated the Company's media policy by failing to inform Duchaney about the interview that was held in the Holbrook studio. At a meeting on November 21, 2000, attended by Fisher, Duchaney, Copithorne and Fitzgerald, Copithorne informed Fisher that she was being terminated because she had violated Company policies and Duchaney "couldn't trust [her] anymore." (Fisher Dep. Tr. 179-80).

---

[5] Fisher does not dispute that she told the boys that in order for them to be producers of the show, their parents would need to be involved and take responsibility. Pl.'s Opp'n at 5.

[6] In essence, the Company suggests that the real reason for the show's cancellation–that Branczewski was not a resident of Holbrook and therefore could not produce the show–was not accurately communicated to the boys and their parents by Fisher.

After Fisher was terminated, her position was temporarily filled by a number of Company employees, including Duchaney, Debi Donna and Michele Roy. The Company posted a staffing requisition for the position on November 27, interviewed a number of candidates, and ultimately elected to transfer Kevin Bows from the company's Dedham studio to the Holbrook studio on or about January 16, 2001.

### III.  Discussion

#### A.  The Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Fisher therefore must do more than highlight disputed factual issues of a general nature; she must offer evidence sufficient to demonstrate that a dispute exists as to whether her termination was the result of legitimate, non-discriminatory considerations or was impermissibly motivated by gender discrimination. See Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 431 (1st Cir. 2000).

The Court of Appeals for this Circuit has stated that District Courts must "exercise particular caution before granting summary judgment for employers on such issues as pretext, motive, and intent." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 54 (1st Cir. 2000). This does not mean, however, that summary judgment is "automatically preclude[d] . . . in cases where elusive concepts such as motive or intent are at issue. . . . [I]f the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation, summary judgment may

be appropriate even where intent is an issue." Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 167 (1st Cir. 1998)(internal quotation marks and citations omitted)..

In deciding the motion for summary judgment, I have construed all facts in the light most favorable to the plaintiff, the non-moving party, and have drawn all reasonable inferences in her favor.

### B.    The Title VII and Mass. Gen. L. ch. 151B Analysis

Because there is no direct evidence of discriminatory animus and causation, the analysis of both Fisher's federal and state discrimination claims is governed generally by the three-step, burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973).  See Rossiter v. Int'l. Bus. Machs. Corp., Civ. No. 04-10069-DPW, 2005 WL 2722929, at *6 (D. Mass. Oct. 19, 2005); Sullivan v. Liberty Mut. Ins. Co., 825 N.E.2d 522, 530 (Mass. 2005).

Under the McDonnell Douglas approach, the plaintiff first is required to demonstrate a prima facie case of discrimination.  This can be accomplished by showing that: "(1) she belonged to a protected class, (2) she performed her job satisfactorily, (3) her employer made an adverse employment decision against her, and (4) her employer continued to have her duties performed by a comparably qualified person of the opposite gender."  See Santiago-Ramos, 217 F.3d at 54; Iorio v. Aramark Servicemaster, Civ. No. 03-40147-FDS, 2005 WL 3728715, at *14 (D. Mass. Sept. 30, 2005).  If the plaintiff meets this burden, the employer may rebut the presumption of discrimination created by the prima facie case by articulating a legitimate, non-discriminatory reason for the termination and producing some credible evidence to support the proffered reason.  McDonnell Douglas, 411 U.S. at 802-03.  At the final stage, the plaintiff must submit evidence tending to

demonstrate that the defendant's articulated reason for the termination is merely a pretext for its real, discriminatory decision. Id. at 804-05.

With respect to the last stage, the standard that Fisher must meet to avoid summary judgment on her 151B claim may be less stringent than that established in the Title VII jurisprudence. Under Massachusetts law, a plaintiff may be able to get her case to a jury if she can present evidence sufficient to support a finding that at least one of the reasons given by the defendant for her termination was deliberately false. See Joyal v. Hasbro, Inc., 380 F.3d 14, 17 (1st Cir. 2004) (discussing Lipchitz v. Raytheon Co., 751 N.E.2d 360, 366 (Mass. 2001)). In contrast, in order to survive summary judgment on her Title VII claim, the plaintiff must present evidence from which the trier of fact could reasonably conclude that the proffered reason for the plaintiff's termination was false *and* that the true reason was discriminatory. See Currier v. United Techs. Corp., 393 F.3d 246, 254 (1st Cir. 2004) (citing Brennan v. GTE Gov't Sys. Corp., 150 F.3d 21, 26 (1st Cir. 1998)); Rodriguez v. SmithKline Beecham, 224 F.3d 1, 8 n.12 (1st Cir. 2000).

    **1.**  *The Prima Facie Case*

Fisher's burden at the preliminary stage of the McDonnell Douglas analysis is not particularly heavy. She can easily demonstrate that three of the four factors are met: she belonged to a protected class (females); her employer took an adverse employment action against her (she was fired); and she was ultimately replaced by a similarly qualified male. Whether or not she had been performing her job satisfactorily is a much closer question. The evidence demonstrates that the Company received a number of complaints about Fisher's involvement with "Cooking Creatively"; Fisher's supervisors had warned her repeatedly that they were concerned about her level of involvement with the show; she had received a final written warning from Duchaney after allowing the electrical line to be

installed in the Holbrook studio without permission; and Duchaney believed (a) that she had lied to him about who was actually producing "Cooking Creatively" and (b) that she had violated the Company media policy by permitting an interview to take place in the Holbrook studio. The record does not contain any affirmative evidence of satisfactory performance during the relevant time period, such as favorable performance reviews, salary raises, awards or recognitions, or promotions. About the only basis for inferring that her performance was satisfactory is the fact that she was not fired sooner. Courts regard the burden on the employee to show satisfactory performance as a minimal one, see, e.g., Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 9 n.3 (1st Cir. 1990) (stating that with respect to the second element of the prima facie case, a plaintiff can demonstrate that she performed her job at an acceptable level even if "[t]he record evidence as to job performance, while heavily weighted toward defendant's view, [is] nevertheless mixed"), but it is not entirely illusory. I am inclined to think that carrying the burden requires something more than simply showing that the employee so far had avoided termination, at least where (as here) the record indicates some level of employer dissatisfaction. If that is so, Fisher has not carried her burden of establishing a prima facie case. However, because the point is debatable, and because Fisher's case is so clearly deficient in other ways, I do not rest my decision on this ground.

### 2. *The Legitimate, Non-discriminatory Motive*

AT&T has offered a legitimate, non-discriminatory motive for its termination of Fisher: the Company concluded that her conduct had violated its policies and, given her history, her supervisor felt he "couldn't trust [her] anymore." (Fisher Dep. Tr. 179-80). Fisher does not dispute that she violated the Company's policies by permitting "Cooking Creatively" to install a 220-volt electrical line in the Holbrook studio without the permission of the Company or the Town of Holbrook, which

11

owned the building in which the studio was located. Although Fisher disputes the conclusion, AT&T also says that it acted in light of an employment history that it believed included Fisher's violation of the Company's conflict of interest policy by allowing her personal relationship with Branczewski to interfere with her professional responsibilities; violation of its media policy when she failed to inform her supervisor that a reporter from the Patriot Ledger was conducting an interview with Branczewski in the Holbrook studio; and her "miscommunication" regarding "Cooking Creatively's" cancellation, which led to complaints from the Holbrook Cable Advisory Board and negative publicity for the Company.

### 3.   *Pretext*

AT&T having offered evidence that it had legitimate, non-discriminatory reasons for the termination, the burden shifts to Fisher to, at a minimum, supply evidence that raises a genuine issue of material fact as to whether the reasons proffered by the Company were pretextual.

#### a.   **The Title VII Claim**

As to the federal claim, Fisher must provide evidence from which the trier of fact could reasonably conclude that the proffered reason for her termination was false *and* that the true reason was discriminatory. See Currier, 393 F.3d at 254. Fisher has not provided evidence that would permit a rational trier of fact to conclude either necessary proposition.[7] That is, as discussed more

---

[7] Fisher claims that Duchaney favored Gary Machaby over her, such as by not reprimanding him for yelling at Fisher when she mistakenly failed to air his show during its scheduled time slot. However, the record includes evidence that during the time Fisher was working at the Holbrook studio, Duchaney repeatedly took Fisher's side when Machaby complained about "Cooking Creatively," assuring Machaby that, as Fisher had told him, "Cooking Creatively" was produced and crewed by Holbrook high school students. (Pl.'s Tab Seven). Furthermore, Duchaney's failure to reprimand Machaby for his confrontation with Fisher does not, without more, raise an inference of gender bias.

fully below, she has not offered evidence that could form the basis for a rational inference that the articulated reasons were false. The events referred to in the reasons all indisputably occurred; the only basis for finding the reasons to be pretextual would be to conclude that the Company did not truly regard such matters as a basis for terminating Fisher. There is nothing in the record to justify that conclusion.

As to the second proposition, there is no evidence that the true motivation for her dismissal was her sex. She explicitly admitted as much in her deposition:

> Q: What evidence do you have that the motivation for your termination in whole or in part was because you are a woman?
>
> A: I have no evidence.

Fisher Dep. Tr. 101.

### b.     The 151B Claim

Fisher's burden with respect to the 151B claim is arguably lower: she need only adduce evidence sufficient to support a finding that at least one of the reasons given by the defendant for her

---

Fisher also suggests that one of the reasons for her transfer from the West Bridgewater studio to the Holbrook studio was to remove her from a situation where she was being harassed by a male coworker. Fisher intimates that the harassment may have been sexual in nature, but she offers no evidence to support the suggestion.

Finally, Fisher argues that the fact that she was terminated because her male supervisor held her to the unwritten "spirit" of the Company's policies and procedures is evidence of gender-based animus. The evidence, however, is that Fisher was not fired by the unilateral decision of a male supervisor but rather was only terminated after a group of male and female superiors – Duchaney, his supervisor Wendy Copithorne, Bobbi Sym (Regional Director of Human Resources), Michael Leone (Department Head), R.B. Lerch (acting Vice President), and Joyce Fitzgerald (Human Resources) – all came to the joint conclusion that Fisher had violated the Company's policies and procedures.

termination was deliberately false. See Joyal v. Hasbro, Inc., 380 F.3d 14, 17 (1st Cir. 2004) (discussing Lipchitz, 751 N.E.2d at 366).

A careful reading of the Company policies in effect during the term of Fisher's employment supports her contention that she was terminated for failing to adhere to the Company's interpretation of the policies, not for violating the express language of the policies. For example, the media policy, as written, does not address what an employee should do when she finds out that an interview of a show's host (a non-employee) is being conducted in one of the Company's studios; it only appears to provide guidance for those situations where an employee is approached with a request for information. Similarly, the Company's conflict of interest policy, as written, gives a general description of how conflict of interest issues might arise "when [an employee's] personal interests . . . conflict with the interests of the Company and/or with [her] loyalty, judgment or decision making," but it does not explicitly address relationships (of any sort) between employees and customers.

That being said, merely demonstrating that an employee was terminated based on a company's interpretation of its policies, without more, is not sufficient to prove that the company's reasons were pretextual, particularly where, as here, the interpretation and application of those policies is reasonable and does not appear to be a *post hoc* justification. The realities of the business world suggest that a company's stated policies and procedures need to be broad and flexible enough to apply to a wide range of situations, situations both common and unanticipated. Managers and supervisors therefore are faced with the task of interpreting and applying the written policies to new situations as they arise. Recognizing realities like this, the First Circuit has emphasized that when assessing pretext, courts "focus must be on the perception of the decisionmaker [and assess] whether the employer believed its stated reason to be credible." See Mesnick v. Gen. Elec. Co., 950 F.2d 816,

824 (1st Cir. 1991)(internal quotation marks and citations omitted). "Courts may not sit as super personnel departments, assessing the merits-or even the rationality-of employers' nondiscriminatory business decisions." Id. at 825.

Thus, while Fisher has argued that her interpretation of the policies and their applicability to her conduct is *different* from that of AT&T's, she has not produced evidence that would permit the conclusion that the defendant's proffered reasons for her termination were deliberately *false*. There are no demonstrated "incoherencies . . . or contradictions" in the company's explanations, and its interpretation of the policies and their application to Fisher's case appears both plausible and consistent with the bulk of the evidence presented. See Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 168 (1st Cir. 1998)(quoting Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997)) (internal quotations omitted). I therefore conclude that Fisher has not raised a genuine question of material fact as to whether AT&T's proffered reasons for her termination are pretextual. For this reason, she cannot, as a matter of law, prevail on her Chapter 151B claim.

      C.     **The Wrongful Termination Claim**

Fisher's complaint also includes a claim for "wrongful termination." It is not clear whether Fisher intends her common law claim to be one grounded in tort law (wrongful termination, as alleged in the complaint) or contract law (breach of the covenant of good faith and fair dealing, as suggested in her opposition to the motion for summary judgment). Regardless, neither the facts before the court nor state law precedent appear to support her claim.

Fisher was an "at-will" employee. This is stated clearly in the Employment Agreement she signed when she was first employed by the company.[8] (Def.'s Tab 4). Her status as an employee-at-will is further confirmed by the Employee Handbook and the company's ethics handbook, "Doing What's Right," (Duchaney Aff. Exs. D and E), and Fisher has offered no contradictory evidence that might support a conclusion that an employment contract, express or implied, existed between her and the company.

An employment-a t-will is typically terminable by either party at any time, with or without cause. See Kolodziej v. Smith, 588 N.E.2d 634, 638 (Mass. 1992). Under Massachusetts law, a terminated at-will employee is therefore only able to recover against her employer in very limited circumstances, typically when she can demonstrate that her termination violated an important, well-defined public policy. This is true regardless of whether a tort or a contract theory is pursued. See Orell v. UMass Mem. Med. Ctr., 203 F. Supp.2d 52, 68 (D. Mass. 2002) ("A plaintiff has a cause of action in tort for wrongful discharge when she is an at-will employee and is discharged in violation of public policy."); Ruffino v. State St. Bank and Trust Co., 908 F. Supp. 1019, 1053 (D. Mass. 1995) (Massachusetts courts recognize an implied covenant of good faith and fair dealing in many at-will relationships, and claims for a breach of that covenant are cognizable when an employer's reasons for taking an adverse employment action are contrary to public policy.).

---

[8] The agreement contains a section entitled "Employment At Will" which reads, in relevant part: "This at-will employment relationship may not be modified, unless in a written agreement properly signed by you and an authorized officer of US WEST. Nothing contained in the offer letter on this Attachment, or other communications, creates or implies an employment contract for any specific period of time."

Fisher has not articulated what important public policy (other than sex discrimination) might have been violated when AT&T fired her. To the extent that she would argue that her termination violated the public policy against sex discrimination, her wrongful termination claim is preempted by Mass. Gen. L. ch. 151B. See Ruffino, 908 F. Supp. at 1053 (stating that a court's recognition of a claim for breach of implied covenant of good faith and fair dealing is "limited to situations in which there is no other adequate way to vindicate established public policy"); see also Choroszy v. Wentworth Inst. of Tech., 915 F. Supp. 446, 451 (D. Mass. 1996) (stating "where applicable, G.L. c. 151B provides the exclusive remedy for employment discrimination not based on preexisting tort law or constitutional protections"); Melley v. Gillette Corp., 475 N.E.2d 1227,1229-30 (Mass. App. Ct. 1985)(holding that the court should not create a new common law remedy where it might interfere with Chapter 151B's comprehensive remedial scheme and affirming dismissal of plaintiff's wrongful termination claim based on age discrimination), *aff'd*, Melley v. Gillette Corp., 491 N.E.2d 252 (Mass. 1986). The evidence she has offered is not sufficient to permit a reasonable jury to find that AT&T violated any other public policy or duty of good faith and fair dealing it might have owed to her.

**IV.  Conclusion**

For the foregoing reasons, the defendant's motion for summary judgment is GRANTED with respect to all counts. Judgment shall enter for the defendant.

It is SO ORDERED.

| | |
|---|---|
| March 31, 2006 | \s\ George A. O'Toole, Jr. |
| DATE | DISTRICT JUDGE |